532 A.2d 315

**ALLEGHENY HOUSING REHABILITATION CORPORATION, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, PENNSYLVANIA HUMAN RELATIONS COMMISSION, Appellee.**

Supreme Court of Pennsylvania.

Submitted March 11, 1987.

Decided Oct. 15, 1987.

Stanley M. Stein, Feldstein, Grinberg, Stein & McKee, Pittsburgh, for appellant.

Elisabeth S. Shuster, Gen. Counsel, William R. Fewell, Jr., Asst. Gen. Counsel, Pennsylvania Human Relations Com'n, Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

126

## OPINION

ZAPPALA, Justice.

This is an employment discrimination case brought under Section 5(a) of the Pennsylvania Human Relations Act, 43 P.S. § 955(a). The Human Relations Commission found that Faith Hodge was discharged from her employment because of her sex. It awarded back pay and interest, entered a "cease and desist" order, imposed various notice requirements designed to apprise Hodge and other potential female applicants of positions, and instituted a reporting system to monitor hiring practices. Commonwealth Court held that the Commission's finding of discrimination was supported by substantial evidence and affirmed the order, 88 Pa.Cmwlth. 443, 489 A.2d 1001. We allowed the employer's appeal to examine the lower tribunals' method of applying the law in examining the evidence to reach a conclusion on the ultimate issue of discrimination.

In July of 1978, Faith Hodge took up residence at Second East Hills Park, a housing development in Pittsburgh. She had lived at Second East Hills until May of that year, when she left her employment as a City of Pittsburgh police officer in order to move to California. After her return, Hodge inquired of the resident manager of Second East Hills about a job as a security officer at the development. Hodge had known the manager from work with several community organizations around Pittsburgh. The resident manager, an employee of the defendant/appellant Allegheny Housing Rehabilitation Corporation, hired Hodge as a security officer in mid-August of 1978. Within a month he had assigned her additional duties and told her she was being designated "security manager" at Second East Hills. By letter dated November 2, 1978, slightly more than two months after Hodge had been hired, Allegheny Housing's Director of Management, the resident manager's superior, advised Hodge that her "services as Security Manager [had] been terminated due to the realignment of our security force."

Allegheny Housing Rehabilitation Corporation is a limited profit corporation that manages non-profit and low income housing developments. In August of 1977, Allegheny Housing was hired as management agent of Second East Hills by the owner, Action Housing, which was at the time attempting to arrange a sale of the development. In 1978, Action Housing defaulted on its mortgage, and the Department of Housing and Urban Development assumed operation of the development as mortgagee in possession. Allegheny Housing was retained as the management agent by HUD. Pursuant to regulations governing developments where HUD was mortgagee in possession, in the summer of 1978 Allegheny Housing undertook the task of providing security services for Second East Hills within a budget amount imposed by HUD. Bids from several security firms were rejected as too high. Eventually, Allegheny Housing hired individuals as independent contractors[1] to serve as security guards.

Hodge filed a complaint with the Human Relations Commission alleging that she was discharged from her job because of her sex. Section 5(a) of the Human Relations Act, 43 P.S. § 955(a) provides

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification ... [f]or any employer because of the ... sex ... of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required.

The Human Relations Commission and the Commonwealth Court purported to follow the analytical model developed by the United States Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

---

1. For purposes of this action under the Human Relations Act, Allegheny Housing concedes its status as "employer" and the guards' status as "employees".

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), first approved by this Court for employment discrimination cases under the Human Relations Act in *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976). That model sets out the nature of the evidence needed for the plaintiff to establish a *prima facie* case, for the defendant to respond, and for the plaintiff to counter the defendant's response. In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and again in *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court addressed itself to the proper application of this analytical model. In particular, the Court clarified the nature and the extent of the defendant's burden of production. This case presents us with an opportunity to give similar guidance to the lower tribunals in our state system.[2]

**2.** Because it deals with comparative qualifications, which is not an issue in all cases, the "best able and most competent" language of our Human Relations Act has been the source of considerable confusion. *See Winn v. Trans World Airlines, Inc.,* 506 Pa. 138, 484 A.2d 392 (1984) (equally divided court). According to one view, this language operates primarily in "disparate impact" cases to establish a correlative of the "business necessity defense" found in Title VII cases. Its effect in "disparate treatment" cases, such as the present, is limited to allocating the burdens of proof in the same way as described in *McDonnell Douglas, Burdine,* and *Aikens. See id.,* 506 Pa. at 146, 484 A.2d at 396 (Opinion in Support of Affirmance, Nix, C.J., joined by Larsen, J.); *id.,* 506 Pa. at 157–58, 484 A.2d at 402–03 (Opinion in Support of Affirmance, Larsen, J., joined by Nix, C.J.). Another view treats the language as creating an element of *any* cause of action under the section, whether under the disparate impact or disparate treatment theory, and would assign the burden of proof as to that element to the plaintiff. *See id.,* 506 Pa. at 159, 484 A.2d at 403 (Opinion in Support of Reversal, Flaherty, J., joined by McDermott and Zappala, JJ.). *See also,* Note, The Burden of Proof in Employment Discrimination Cases Under the Human Relations Act: The "Best Able and Most Competent" Clause Revisited, 58 Temp.L.Q. 307, 332–33 (1985). Here, the parties and the lower tribunals proceeded as though the "best able and most competent" language had no effect on the *McDonnell Douglas* elements of either the employee's *prima facie* case or the employer's defense; the defendant has never contended that the plaintiff bore the burden of proving that she was "best able and most competent." The focus of our review is limited to whether the *McDonnell Douglas* model, whatever the elements, has been properly used.

In *McDonnell Douglas,* the Court stated that the burden of establishing a *prima facie* case could be met by showing "(i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. This standard is, to be sure, adaptable to accommodate differences in the nature of the discrimination alleged (e.g., sex rather than race) and in the action alleged to be improper (e.g., discharge rather than refusal to hire). The form it takes, however, must be appropriate to its function, which is to "eliminate[ ] the most common nondiscriminatory reasons" for the employer's action. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

In the Opinion accompanying its order, the Commission expressed the view that Hodge could meet her burden of establishing a *prima facie* case "by proving that she was discharged for reasons not having to do with her performance, and that males were subsequently hired to perform essentially the same duties as she performed prior to her discharge." The Commonwealth Court offered a more specific statement of the elements: "(1) she is a member of a protected class (female), (2) that she was hired for a job for which she was qualified, (3) that she was discharged, and (4) that she was replaced with one or more males with equal or lesser qualifications." 88 Pa.Comwlth. at 448–49, 489 A.2d at 1004.

Each of these formulations in isolation might be considered flawed for failing to eliminate several common, non-discriminatory reasons for discharge, the Commission's moreso than the court's. This "flaw" would become harmless, however, if the remainder of the analysis were properly applied to the entire case. This is because the nature of the burden that "shifts" to the defendant when a *prima facie* case is established is simply to produce evidence of a "legitimate, non-discriminatory reason" for the discharge.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481; *Burdine,* 450 U.S. at 254–58, 101 S.Ct. at 1094–96; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 24–25, 99 S.Ct. 295, 295–96, 58 L.Ed.2d 216 (1978) (per curiam); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).  If such evidence is presented, the question for the Commission is whether, on *all* the evidence produced, the plaintiff has persuaded it by a preponderance of the evidence that the employer intentionally discriminated against her.  Whether the plaintiff must eliminate a certain non-discriminatory reason as part of making a *prima facie* case, or discredit the evidence of that same reason produced by the employer after plaintiff's *prima facie* case has been made, the result is the same;  the plaintiff must persuade the factfinder by a preponderance of the evidence.

There is bound to be confusion where, as here, part of the employer's explanation attacks the plaintiff's qualifications for the job.  If a plaintiff must *prove* a *prima facie* case by producing the evidence of her qualifications before the defendant is obligated to proceed with a defense, there will almost of necessity be, at the close of the plaintiff's case in chief, evidence that she was qualified sufficient to avoid dismissal.  At that point no evidence has been admitted on the other side.  When the employer then produces evidence of disqualification, this could be understood either as an attack on the elements of the *prima facie* case, or as an attempt to meet the employer's burden of offering a legitimate, non-discriminatory reason.  Regardless of its characterization, however, its impact is the same.  The employer, understandably, would prefer not to have to offer a defense at all until a more substantial case had been presented against it.  Nevertheless, in the interest of having the ultimate question of discrimination resolved on the merits rather than for procedural failings such as lack of specificity, given the importance of circumstantial proof in such cases, it is appropriate to the remedial purpose of the Act that the prima facie case not be an onerous one.

■ It was never intended, however, that the previously described analytical method would immunize members of "protected classes" from adverse employment decisions simply by dint of their class membership. Nothing about the Human Relations Act removes its operation from the bedrock concept of our jurisprudence that one who alleges wrongdoing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. Absent a response, the "presumption" of discrimination arising from the plaintiff's *prima facie* case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a *prima facie* case. If, however, the defendant offers a non-discriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then "decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. The plaintiff is, of course, free to present evidence and argument that the explanation offered by the employer is not worthy of belief or is otherwise inadequate in order to persuade the tribunal that her evidence does preponderate to prove discrimination. She is not, however, entitled to be aided by a presumption of discrimination against which the employer's proof must "measure up".

■ It is obvious that Hodge, female, was hired and discharged. She testified to her educational background

and the training she had received in becoming a member of the Pittsburgh police force. Payroll records of Allegheny Housing security personnel were also admitted into evidence to show the number of people working and the number of hours worked during the relevant periods before and after Hodge's dismissal. This evidence was, we believe, sufficient to put the employer in the position of offering a non-discriminatory reason for its action.

▇▇ Allegheny Housing, through the testimony of its vice president, supported by the deposition of the director of management, explained Hodge's dismissal as follows. While in the process of soliciting bids for security services for the development, Allegheny Housing was approached by certain residents of Second East Hills who were members of Certified Police Unit 644. C.P.U. 644 is a non-profit organization that functions as a hiring hall for individual security guards. Its members are all certified to carry firearms and have passed a psychological test administered by the state police. Unable to contract with a commercial security firm because of the HUD budget constraints, Allegheny Housing entered into an agreement with C.P.U. 644. Because HUD's involvement as mortgagee in possession was expected to be of short duration, perhaps several months, the agreement was not reduced to writing.

Under this agreement the security personnel hired as independent contractors by Allegheny Housing were to be drawn from the membership of C.P.U. 644. The actual hiring of individual guards was apparently delegated to the resident manager of the development. Despite the resident manager's awareness that only C.P.U. 644 members were to be considered, he hired Hodge, who was not a member, in mid-August, and later gave her supervisory duties over the other guards, who were all members of C.P.U. 644.[3] When this hiring in violation of the agreement was brought to the attention of the director of management by members of

3. Though she was approached about joining C.P.U. 644, Hodge never completed the forms or took the necessary test; she testified that she was not told membership was a condition of employment.

C.P.U. 644, he discharged her. Thereafter a maintenance manager, a long time employee of Allegheny Housing who oversaw operations at a number of developments, was assigned the task of co-ordinating security services as well, encompassing the "supervisory" duties the resident manager had taken it upon himself to give to Hodge. This was the "reorganization" referred to in Hodge's discharge letter.

If the allocation of proof analysis is properly understood, the foregoing must be considered sufficient evidence of a "legitimate, non-discriminatory reason" for Hodge's dismissal to meet Allegheny Housing's burden of production. Whether or not the evidence is ultimately deemed credible, and whether or not it ultimately withstands the weighing of all the evidence, it is indisputably sufficient to raise a question of fact as to whether the employer intentionally discriminated against the employee.

Review of the Opinion of the Commission demonstrates that far from examining the evidence as a whole to decide the ultimate question of discrimination, the Commission, upon determining that a *prima facie* case had been made out, treated Hodge's evidence as established facts to be disproved, if possible, by Allegheny Housing. This approach is apparent in Conclusion of Law No. 8, where the Commission stated, "Respondent has failed to demonstrate that its conduct in terminating the Complainant did not violate the Act. Its explanations for the termination were pretextual." Again, in its Opinion, the Commission stated, "[i]f she makes this showing [of a *prima facie* case], Respondent may still prevail by showing that its conduct did not violate the Act."

The Commonwealth Court, having the benefit of *Aikens* and *Burdine*, recognized the error in this approach, characterizing it as coming "dangerously close to shifting the ultimate burden of persuading the trier of fact that the employer's motives were *not* discriminating upon the employer." 88 Pa.Cmwlth. at 447 n. 3, 489 A.2d at 1003 n. 3 (emphasis in original). Nevertheless, the court's opinion

showed the same mistaken approach to analyzing the evidence when, in dismissing a hearsay question as unimportant, it stated that Allegheny Housing's "failure to articulate a *legitimate* non-discriminatory motive for discharging Complainant obviated the need for Complainant to proceed with the ultimate burden of proving [the] intent to discriminate against her." *Id.* at 451–52, 489 A.2d at 1006 (emphasis in original). The court's emphasis on the word "legitimate", coupled with its review of the Commission's findings that the evidence failed to disprove discrimination, betrays a hidden understanding that the probative value of the employer's explanatory evidence is to be independently weighed; if it is found to be somehow lacking, the explanation may be disregarded as "not legitimate", thus allowing the presumption arising from the *prima facie* case to stand as the only proof of the ultimate issue. As we have previously explained, this was error. Whatever additional information is imparted by adding the term "legitimate" to "non-discriminatory reason", the remainder of the Supreme Court's explanation of the employer's burden of production reveals over and over again that it cannot be given this effect. Especially where the prevailing principle is that non-contractual employment is "at will", permitting discharge for any reason or no reason at all subject only to the requirement that it not be discriminatory, the test of the "legitimacy" of an employer's reason cannot be made so onerous. To hold otherwise would be to grant safe haven to "protected classes" against adverse decisions *not* based on their class membership, protection not enjoyed by others and not intended by the Human Relations Act, whose purpose is "to foster the employment of all individuals in accordance with their fullest capacities regardless of their ... sex ... and to safeguard their right to obtain and hold employment without *such* discrimination...." Act of October 27, 1955, P.L. 744, § 2 *as amended*, 43 P.S. § 952(b) (emphasis added).

The transcript of the hearing in this case displays a kind of gamesmanship played out between the parties (more precisely, their counsel), with a primary objective being the

presentation of the bare minimum amount of evidence necessary to meet the burdens of proof as they were thought to exist under *McDonnell Douglas* and *General Electric.* Many witnesses whom it would be thought could offer important proof on behalf of both sides were not presented. Because the record is thus woefully inadequate and because the Commission erroneously subjected the employer's proof to a heightened level of scrutiny, we cannot be certain that its findings of fact were not influenced by its mistaken view of the law or that substantial evidence supports its conclusion.[4] We accordingly vacate the judgment of the Commonwealth Court and remand the case to the Commission for further proceedings consistent with this Opinion.

NIX, C.J., and LARSEN, J., filed a dissenting opinion in which PAPADAKOS, J., joined.

NIX, Chief Justice, dissenting.

As noted by Mr. Justice Larsen in his dissenting opinion, the issue in this appeal was one of credibility. There is no dispute as to the law applicable in this matter. The credibility of witnesses was assessed by the Human Relations Commission and their findings supported the award. The Commonwealth Court affirmed and I find no legitimate basis for this Court to disturb that order.

PAPADAKOS, J., joins in this dissenting opinion.

4. There is, for example, an obvious conflict in the Commission's reliance on a document titled "Security Force Policy", drafted after Hodge's discharge, to establish that the security supervisor's duties were identical to Hodge's duties, and thus discredit Allegheny Housing's contention that the resident manager had created the supervisory position and given it to Hodge without authorization. The same document contains an express statement that the employment criteria for security guards at Second East Hills were that they be "certified by the Pennsylvania State Police to carry a firearm, and have passed the psychological test administered by State Police." By her own testimony, Hodge met neither of these criteria at the time she was hired at Second East Hills, although she had weapons certification while she was a police officer. If the document is given credence and considered relevant to conditions at the time of Hodge's employment, the Commission would have to disregard substantial evidence to find that Hodge was qualified.

LARSEN, Justice, dissenting.

This is a case of employment discrimination under section 5(a) of the Pennsylvania Human Relations Act, 43 P.S. § 955(a). The essence of this case is a question of credibility, a question which was clearly resolved by the trier of fact, the Pennsylvania Human Relations Commission (the HRC) against the employer, the appellant herein. The credibility of the witnesses (appellee-complainant and appellant's agents and officers) is a matter peculiarly within the province of the HRC as trier of fact. As that tribunal has resolved the crucial issue of credibility against the employer, as that finding is supported by substantial evidence, and as that finding is dispositive of the ultimate issue of employment discrimination in this case, I would affirm the Commonwealth Court's affirmance of the HRC's determination and award. Accordingly, I dissent.

Initially, appellee met her burden of establishing a prima facie case of employment discrimination under the *McDonnell Douglas/Burdine/Aikens*[1] evidentiary guidelines and standards. That burden of proof was met when appellee established that she was a member of a protected class (female), that she was qualified for the positions in question (she was, in fact, hired as a security officer and promoted promptly to security manager), that she was discharged, and that, after her discharge, non-members of the protected class (males) of equal or lesser qualifications replaced her. The HRC found that appellee established each of these elements of the prima facie case, and that finding is supported by substantial evidence of record. The majority concedes that appellee met this initial burden of proof, stating that her "evidence was ... sufficient to put the employer in the position of offering a non-discriminatory reason for its action." Majority op. at 131.

1. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

The employer, appellant, proceeded to offer three non-discriminatory reasons for discharging appellee. The HRC specifically rejected those reasons, finding them to be unworthy of credence. Thus the HRC did not accept these stated reasons for discharge as "legitimate, non-discriminatory reasons," and found them to be "pretextual." This determination of credibility was based upon inferences raised by substantial record evidence, and was fully within the function and competency of the HRC.[2]

Because appellee established a prima facie case that her discharge was discriminatory and because the employer failed to advance any "legitimate, non-discriminatory" reasons for her discharge (i.e., the employer failed to advance any non-discriminatory reasons which the trier of fact, the HRC, found worthy of belief), appellee has sustained her burden of persuasion under the *McDonnell Douglas/Burdine/Aikens* standards. Those standards were summarized and clarified by the United States Supreme Court in *Aikens:*

2. The Commonwealth Court summarized the HRC's finding that the employer's proferred reasons for discharge were pretextual stating: The HRC in its adopted opinion, listed and disposed of three allegedly non-discriminatory reasons offered for Complainant's discharge at the hearing. In response to AHRCO's [the employer's] assertion that it was compelled to discharge Complainant from her position as Security Manager because there was no such position under the rules and regulations provided to AHRCO by the Federal Department of Housing and Urban Development, the HRC stated that such explanation ignores the plain language of Complainant's letter of termination which advised she was being terminated from the position of Security Manager and was mere pretext. Similarly, it rejected AHRCO's assertion that the "realignment" which it offered as explanation to Complainant in its letter to her informing her of her discharge was prompted by economic necessity as the "realignment" resulted in more rather than fewer security officers working at Second East Hills Park. Finally, it rejected, also as pretext, AHRCO's assertion that it was obligated to discharge Complainant because she was not a member of Certified Police Unit 644 (CPU 644) with whom AHRCO allegedly had an exclusive "hiring hall" arrangement with regard to its security staff. The HRC found as fact that Complainant had never been informed, either prior or subsequent to hire that membership in CPU 644 was a condition of employment and that if, indeed, there was such an exclusive relationship, no documentary evidence to support the assertion had been produced.
88 Pa.Comwlth. at 450–51, 489 A.2d at 1005.

By establishing a prima facie case, the plaintiff in a Title VII action creates a rebuttable "presumption that the employer unlawfully discriminated against" him ... To rebut this presumption, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." ... In other words, the defendant must "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." ...

But when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the *McDonnell–Burdine* presumption "drops from the case," ... and "the factual inquiry proceeds to a new level of specificity." ...

The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." ... As we stated in *Burdine: "The plaintiff retains the burden of persuasion. [H]e may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."* ...

460 U.S. at 713–16, 103 S.Ct. at 1480–82 (citations omitted).

Here, the appellee's burden of persuasion was met by evidence which established a prima facie case of discrimination and which raised an inference that "a discriminatory motive more likely motivated the employer,"[3] and by "indi-

---

3. The majority seems to believe that, simply because the "presumption drops from the case" when an employer offers "legitimate, non-discriminatory reasons" for its actions, the mere articulation of non-discriminatory reasons (even if not believed) nullifies any *inference* of discrimination that could be raised by the evidence offered to demonstrate a prima facie case. It seems clear that, even though a complainant may not be entitled to rely on a "presumption" of discrimination once an employer advances *legitimate,* non-discriminatory reasons, nevertheless the evidence which complainant has offered to

rectly showing that the employer's proffered explanation [was] unworthy of credence."

Despite substantial evidence on the record to support the HRC's determination that appellee's discharge was discriminatory, the majority vacates the Commonwealth Court's affirmance because of perceived "flaws" in the application of the *McDonnell Douglas/Burdine/Aikens* standards by these tribunals. It is true that the HRC's articulation of these standards was less than exact and left something to be desired. As the Commonwealth Court observed, that articulation came "dangerously close to shifting the ultimate burden of persuading the trier of fact that the employer's motives were *not* discriminatory upon the employer." 88 Pa.Comwlth. at 447, n. 3, 489 at 1003.[4] However, as the Commonwealth Court recognized, this erroneous articulation of the standards amounted to harmless error under the circumstances, in light of the HRC's explicit rejection of the employer's purported non-discriminatory explanations for appellee's discharge as not worthy of belief.

The majority formulates the ultimate issue regarding the burden of persuasion as follows:

Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, *the trier of fact must then "decide which party's explanation of the employer's motivation it believes."* Aikens, 460 U.S. at 716, 103 S.Ct. at 1482.

Majority op. at 131. It is clear that the HRC, the trier of fact, has done exactly that, as it decided to believe the appellee's explanation of the employer's actions and to disbelieve the employer's purported non-discriminatory explanations, finding them pretextual. I reiterate that, as the

support a prima facie case may still support an *inference* of discrimination to be weighed along with all of the evidence.

4. This "danger" arose from the HRC's eighth conclusion of law, which reads: "Respondent has failed to demonstrate that its conduct in terminating Complainant did not violate the Act. Its explanations for the termination were pretextual."

United States Supreme Court stated in *Aikens*, the burden of persuasion may be met by the discrimination complainant by "indirectly showing that the employer's proferred explanation is unworthy of credence," as was done here. On this basis, I would affirm the Commonwealth Court's affirmance of the HRC's determination that appellant's discharge of appellee was discriminatory, even though the HRC's formulation of the evidentiary standards governing these cases was in error.

The majority also faults the Commonwealth Court's articulation of the governing standards, specifically that court's statement that the employer's "failure to articulate a *legitimate* non-discriminatory motive for discharging Complainant obviated the need for Complainant to proceed with the ultimate burden of proving the intent to discriminate against her." Majority op. at 134, citing Commonwealth Court opinion at 88 Pa.Comwlth. at 451–52, 489 A.2d at 1006 (emphasis in Commonwealth Court opinion). From this statement, the majority concludes:

> The court's emphasis on the word "legitimate", coupled with its review of the Commission's findings that the evidence failed to disprove discrimination, betrays a hidden understanding that the probative value of the employer's explanatory evidence is to be independently weighed; if it is found to be somehow lacking, the explanation may be disregarded as "not legitimate", thus allowing the presumption arising from the prima facie case to stand as the only proof of the ultimate issue. As we have previously explained, this was error.

Majority op. at 134.

The majority's concerns that the Commonwealth Court applied some "hidden understanding" of the party's respective burdens of production of evidence and of persuasion are unfounded. First, as the majority acknowledges, the "offending" passage is evaluated out of its context, which context was the rebuttal of appellant's argument that appellee had proven her case solely on certain hearsay evidence. Second, and more important, the Commonwealth Court ex-

plicitly and correctly demonstrated its understanding of the proper analysis to be applied in employment discrimination cases when it stated earlier in its opinion:

First, as stated above, Complainant has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. The essential elements of Complainant's *prima facie* case of discrimination on the basis of sex are that (1) she is a member of a protected class (female), (2) that she was hired for a job for which she was qualified, (3) that she was discharged, and (4) that she was replaced with one or more males with equal or lesser qualifications.

If the Complainant, succeeds in proving the *prima facie* case, there is a rebuttable presumption of sex discrimination, and the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employee's discharge. If the defendant succeeds in rebutting the presumption of discrimination, it is the Complainant's obligation to prove by a preponderance of the evidence that the reasons offered by the defendant were pretextual. *The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the Complainant is always the Complainant's.*

88 Pa.Comwlth. at 448–49, 489 A.2d at 1004 (emphasis added).

Finally, it seems to me that the majority improperly invades the province of the trier of fact and substitutes *its* evaluation of the credibility of the evidence in stating:

If the allocation of proof analysis is properly understood, *the foregoing* [reasons for discharge proferred by the employer] *must be considered sufficient evidence* of a "legitimate, non-discriminatory reason" for [appellee's] dismissal to meet [the employer's] burden of production. Whether or not the evidence is ultimately deemed credible, and whether or not it ultimately withstands the weighing of all the evidence, it is indisputably sufficient

to raise a question of fact as to whether the employer intentionally discriminated against the employee. Majority op. at 133.

The employer's evidence in this case was *ultimately deemed incredible* by the HRC. The HRC, therefore, determined that such evidence was entitled to little or no weight, and the question of fact was *in fact resolved against the employer.* Simply because the employer is able to espouse some neutral explanation for an adverse employment decision does not automatically elevate that explanation to a "legitimate, non-discriminatory reason."

For the foregoing reasons, I would affirm the Commonwealth Court order affirming the order and award of the Pennsylvania Human Relations Commission.

PAPADAKOS, J., joins in this dissenting opinion.