551 A.2d 1142

Newport Township, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent

Argued November 1, 1988, before President Judge CRUMLISH, JR., Judge MCGINLEY, and Senior Judge NARICK, sitting as a panel of three.

*Charles A. Shaffer, Mahler & Shaffer,* for petitioner.

*Francine Ostrovsky,* Assistant Chief Counsel, with her, *Elisabeth S. Shuster,* Chief Counsel, for respondent.

*Ruth Slamon Borland, Borland and Borland,* for intervenor, Dawn Marshall.

OPINION BY SENIOR JUDGE NARICK, December 20, 1988:

In this employment discrimination case brought under Section 5(a) of the Pennsylvania Human Relations Act (Act), Act of October 22, 1955, P.L. 744, *as amended,* 43 P.S. §955(a), the Pennsylvania Human Relations Commission (Commission) found that Dawn Marshall (Complainant) had been discriminated against on the basis of her sex by Newport Township (Township). The Commission, following its review of the record, adopted the findings of fact, conclusions of law, and recommendation of the hearing examiner, as well as the stipulation of facts entered into by the parties. The Commission's order directed the Township, *inter alia,* to cease and desist from rejecting job applicants on the basis of sex and stereotyped presumptions, to pay Complainant a lump sum of $31,219.21, which represented back pay and medical insurance expenses, and to offer Complainant the next available police officer position. The Township has petitioned this Court for review. We affirm.

The following facts were stipulated to by the parties. In the fall of 1982, the Township, a first class township,

announced a vacancy for a full-time police officer position. In order to apply for the police officer position, an applicant was required to take the civil service examination and be at least eighteen years of age. At the time Complainant applied for the police officer job, she met both these qualifications. Also, at the time in question, no job description existed for the police officer position.

There were three parts to the civil service examination: (1) a written test, (2) an oral interview, and (3) a physical examination by a medical doctor. The Township did not take part in the administration of the examination. Under Section 638 of The First Class Township Code,[1] the Township's commissioners were required to notify the Civil Service Commission of a vacancy and request a certified list of eligibles. The Civil Service Commission would thereafter certify from the eligible list the names of the three persons who received the highest average. The Township could then appoint one of the three candidates from the list.

In February 1983, the Civil Service Commission provided the Township with a certified list of eligible job candidates. According to the list, Complainant received the highest score, Philip Roke (Roke) the second highest score and Complainant's husband, Michael Marshall (Marshall), the third highest score.[2] The commissioners did not conduct any interviews of the candidates nor did they have their applications available for review. On March 7, 1983, the commissioners voted to award the police officer position to Roke. The last time the Township had hired a police officer was 1979. At that time, the job was awarded to the top scorer on the civil service examination.

------

[1] Act of June 24, 1931, P.L. 1206, *as amended,* 53 P.S. §55638.

[2] The record reveals that Complainant received an 88.2, Roke an 86.8 and Marshall an 86.2 on the civil service examination.

The hearing examiner made the following additional findings of fact. In 1982 and 1983, Newport Township had five commissioners—Joseph Hillan, John Zyla, Daniel Dule, William Eckrot and Henry Vance. The only objective information used by the commissioners when they were considering who to hire for the police officer position was a civil service list which contained the names of Complainant, Roke and Marshall. The list indicated Complainant was the top scorer. Complainant was interested in and actively sought the police officer position. After her rejection by the Township, Complainant took tests in an effort to become a police officer with either the City of Wilkes-Barre or the Pennsylvania State Police.[3]

In order to determine the qualifications of the candidates, the commissioners haphazardly collected non-specific information through innuendos, idle talk and casual conversation regarding the eligible male candidates. During the March 3, 1983 work session whereby job applicants were discussed, Complainant received far less consideration than the eligible male candidates and positive information regarding Complainant which was known by several commissioners was not shared with all the commissioners. Roke's selection was based in part on the fact that he was married and had two young children. The hearing examiner also found that three of the five commissioners involved in the Roke hiring were involved in the 1979 hiring whereby the top scorer on the civil service examination was selected.

The Township's argument before this Court is that: (1) Complainant neither established a *prima facie* case of discrimination nor did she meet the ultimate burden of proving that she was the best able, most competent

---

[3] The record reveals that Complainant graduated from college in 1984. Complainant is currently a school teacher.

for the job pursuant to Section 5(a) of the Act,[4] and (2) that Roke was the best able and most competent to perform the job of police officer because he had worked as a security guard, had a permit to carry a gun, had a black belt in karate and had experience in doing investigative work, while Complainant was a full-time college student who had worked one summer as a life guard and one summer as a secretary for the Township.[5]

Our analysis will involve several well established legal principles, the first being that our scope of review herein is limited to a determination of whether there was a violation of constitutional rights, an error of law, or whether the findings of fact necessary to support the adjudication are supported by substantial evidence. *Harrisburg School District v. Pennsylvania Human Relations Commission*, 77 Pa. Commonwealth Ct. 594, 466 A.2d 760 (1983). The task of weighing the evidence, both direct and circumstantial, to credit and discredit testimony, to draw inferences and make ultimate findings of fact as to whether a violation of the Act occurred is for the Commission. *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 116 Pa. Commonwealth Ct. 89, 542 A.2d 595 (1988). Of course,

---

[4] The Township states in its brief that Complainant as part of her *prima facie* case was required to establish that a male with equal or lesser qualifications was hired for the position, and that this male was not the best able and most competent to perform the job. The Township further argued that Complainant must carry the burden of proving that she is the best able and most competent to perform the services required.

[5] The Township attempted at oral argument to amend that portion of its argument to indicate that pursuant to Section 5(a) of the Act, Complainant was required to prove she was at least equal to the one chosen. It was not proper to raise this issue pursuant to Pa. R.A.P. 1551(a) as well as Pa. R.A.P. 2116 and 2119; and for purposes of our review, we will adhere to the issues raised by the Township in its brief.

the Commission is a recognized expert in discrimination matters whose judgment will not be lightly substituted. *See Orweco Frocks v. Pennsylvania Human Relations Commission,* 113 Pa. Commonwealth Ct. 333, 537 A.2d 897 (1988).

In employment discrimination cases, a complainant is first required to establish a *prima facie* case of discrimination. The Pennsylvania Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976) adopted the United States Supreme Court's analysis in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973) (a race based refusal to hire case) for establishing a *prima facie* case. This analysis contains four elements: (1) the complainant belongs to a racial minority; (2) he applied for a job for which the employer was seeking applicants; (3) despite his qualifications, he was not hired; and (4) after the rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell-Douglas* at 802; *General Electric Corp.* at 304-306, 365 A.2d at 655-656. This *prima facie* test is adaptable to accommodate differences in the nature of the discrimination alleged. *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 532 A.2d 315 (1987). The form it takes, however, must be appropriate to the function which is to eliminate the most common nondiscriminatory reasons for the employer's action. *Allegheny Housing,* 516 Pa. at 129, 532 A.2d at 318 quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981).

In the case *sub judice,* the Commission set forth the following criteria which Complainant was required to show in order to establish a *prima facie* case: (1) that Complainant belonged to a protected class—female; (2)

that Complainant applied for a job for which the Township was seeking applicants; (3) that despite Complainant's qualifications she was rejected; and (4) that the rejection was under circumstances giving rise to an inference of discrimination. The Township contends in its brief that this *prima facie* case is flawed because Complainant did not establish a male with equal or lesser qualifications was hired and that this male was not the best able, most competent for the position.

While the *prima facie* case adopted by the Commission here may not be flawless, our Supreme Court recently stated in *Allegheny Housing* that the *prima facie* case need not be an onerous one. The court explained:

> This is because the nature of the burden that 'shifts' to the defendant when a *prima facie* case is established is simply to produce evidence of a 'legitimate, non-discriminatory reason' for the discharge. If such evidence is presented, the question for the Commission is whether, on *all* the evidence produced, the plaintiff has persuaded it by a preponderance of the evidence that the employer intentionally discriminated against her. Whether the plaintiff must eliminate a certain non-discriminatory reason as part of making a *prima facie* case, or discredit the evidence of that same reason produced by the employer after plaintiff's *prima facie* case has been made, the result is the same; the plaintiff must persuade the factfinder by a preponderance of the evidence. (Citations omitted.) (Emphasis in original.)

*Allegheny Housing*, 516 Pa. at 129-130, 432 A.2d at 318.

In *Allegheny Housing*, the Supreme Court further explained the evidentiary guidelines to be followed in employment discrimination cases:

> Nothing about the Human Relations Act removes its operation from the bedrock concept of

our jurisprudence that one who alleges wrongdoing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. Absent a response, the 'presumption' of discrimination arising from the plaintiff's *prima facie* case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a *prima facie* case. If, however, the defendant offers a non-discriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then 'decide which party's explanation of the employer's motivation it believes'. The plaintiff is, of course, free to present evidence and argument that the explanation offered by the employer is not worthy of belief or is otherwise inadequate to persuade the tribunal that her evidence does preponderate to prove discrimination. She is not, however, entitled to be aided by a presumption of discrimination against which the employer's proof must 'measure up'. (Citations omitted.)

*Allegheny Housing,* 516 Pa. at 131, 532 A.2d at 319.

Thus, Complainant must ultimately persuade the Commission by a preponderance of the evidence that the Township intentionally discriminated against her. *Allegheny Housing; also see Orweco Frocks.*

In the matter herein, it is undisputed that Complainant was at least eighteen years of age when she took the civil service test, that she applied for an open position for which she was rejected, that she was top scorer on the civil service examination and that the individual hired was the second highest scorer. Complainant's testimony also disclosed that at the meeting whereby a decision to hire a police officer was made, Commissioner Zyla pointed at her and asked, "Can we get her off the list?"[6] Complainant further testified that the Township had never hired a female police officer. We agree with the Commission that these facts establish a *prima facie* case of discrimination, thereby putting the Township in a position to offer a legitimate, non-discriminatory reason for its action.

The Township in order to establish a legitimate non-discriminatory reason for not hiring Complainant offered the testimony of the Township commissioners who took part in the hiring process. Commissioner Hillan testified he voted for Roke because he thought Roke was the most qualified and because Roke was married with two children to support. Commissioner Zyla stated he thought Marshall was the most qualified but voted for Roke because the father of Marshall threatened Zyla that he would be "politically done" if Zyla didn't vote for his son. Commissioner Dule voted for Roke because he was from Dule's ward. Commissioner Eckrot voted for Marshall because he thought Marshall was the most qualified. Commissioner Vance voted for Marshall be-

---

[6] *See* Notes of Testimony (N.T.) from October 21, 1987 hearing at 18.

cause Marshall and his father had approached him seeking his vote and because Marshall was from Sheatown which was Vance's ward.

The Commission determined that this testimony was sufficient for the Township to meet its burden of offering a legitimate nondiscriminatory reason for not hiring Complainant. The Commission continued its analysis, correctly noting that even though the parties bear particular evidentiary responsibilities, the burden of persuasion throughout the entire case remains with Complainant.[7] The Commission concluded that a consideration of all the evidence overwhelmingly supported a finding that Complainant's gender significantly disadvantaged her and that the Township's reasons for not hiring Complainant were pretextual. After a perusal of the entire record herein, we agree that sex discrimination actually motivated the Township's actions in not hiring Complainant.

The only real comparison ever made regarding the relative experiences of the applicants (the oral interview portion of the civil service examination) was virtually ignored. In fact, the only objective information before the commissioners reflected by the scores of the candidates on the civil service examination was in effect disregarded and a purely subjective process in selecting a police officer was substituted. Additionally, there was no job description in existence which could have served as a means of evaluating the applicants.

Our review of the commissioners' testimony discloses the following. Commissioner Hillan testified he

---

[7] In its opinion, the Commission incorrectly stated that after the Township presented its evidence of legitimate nondiscriminatory reasons that the burden then shifted to Complainant to prove that these reasons were actually pretextual. *See Allegheny Housing.* Nevertheless, the Commission's overall analysis in this matter was proper.

knew Roke and his family, and that he asked around about Roke in order to determine his qualifications. From his casual conversation with others in the community, Commissioner Hillan concluded Roke was the most qualified. However, when questioned about this applicant's actual work experience, Commissioner Hillan knew nothing of Roke's job duties, or the length of his employment. Although Commissioner Hillan was aware Complainant had worked one summer with the Township secretary and that she was a college student, Hillan made no inquiries regarding Complainant. Further, Commissioner Hillan testified that although the commissioners discussed the qualifications of Roke and Marshall, Complainant's qualifications were never discussed.

Commissioner Zyla's testimony is particularly revealing. Most blatant is Commissioner Zyla's statement that as far as he was concerned, Complainant did not have any qualifications.[8] Commissioner Zyla testified that he was aware Complainant had worked with the Township secretary and that Complainant's supervisor had told him she was a great asset and doing a fine job. Despite this knowledge, Commissioner Zyla never shared this information with his fellow commissioners. As to Roke's qualifications, Commissioner Zyla testified he asked Commissioner Hillan about Roke and was told that Roke came from a good family, had two children, worked at Jewelcor, had a license to carry a gun and was interested in judo or karate.[9] Commissioner Zyla further stated that he wondered if Complainant was

---

[8] *See* N.T. at 199.

[9] Zyla testified that he believed Marshall was the most qualified and that his reasons for voting for Roke were poor. Zyla stated he voted for Roke because Marshall's father stared him down at the commissioners' meeting and that he was not going to be "defied by" Marshall's father. *See* N.T. at 172.

really interested in the job because no one had ever approached him on her behalf and a fire truck apparatus driver for the Township (who was a male) told him Complainant was taking the test just to see how well she would do. However, when questioned further, Commissioner Zyla stated no one ever approached him regarding Roke and that he did not know whether the fire truck apparatus driver knew Complainant or where this individual got his information.[10]

Commissioner Dule testified that he voted for Roke in order to keep the position in Glen Lyon. Commissioner Dule also admitted that Complainant's qualifications were never discussed. The Commission found Dule's testimony as to why he voted for Roke not credible, noting that all the Township's police officers were from Glen Lyon.

Commissioner Eckrot testified he voted for Marshall and that he assumed Complainant was not interested in the position. Commissioner Vance also testified he voted for Marshall and that he assumed Complainant was not interested in the position.

We now turn to the Township's argument that Complainant was required pursuant to Section 5(a) of the Act to prove she was the best able, most competent for the police position. In *General Electric Corp.*, the Pennsylvania Supreme Court held that the "best able and most competent" clause of Section 5(a) of the Act is an expression of the business necessity doctrine, the purpose of which is to protect employers from having to select employees who do not meet their qualification standards. *General Electric Corp.* at 306-307, 365 A.2d

---

[10] Commissioner Zyla admitted that at the March 7, 1983 meeting he asked a question regarding getting Complainant off the list. He attempted to qualify his statement by indicating he thought she was too young. The Commission found his testimony here not credible.

at 656-57. Therefore, the burden of proving that a complainant is not the best able and most competent is on the employer. *Id.*

Moreover, although the use of subjective criteria is not a per se violation of the law, employment decisions predicated on subjective appraisal should be reviewed with particular suspicion. *General Electric Corp.; Harrisburg School District.* What is esssential to our analysis is the "mind-set" of the commissioners at the time of the alleged discriminatory conduct. *See Action Industries v. Pennsylvania Human Relations Commission,* 102 Pa. Commonwealth Ct. 382, 518 A.2d 610 (1986). Without this searching inquiry into an employer's motives, an employer acting for impermissible motives could easily mask its behavior behind a complex web of after the fact rationalization. *Cf. Peacock v. Duval,* 694 F.2d 644 (9th Circuit 1982).

Here, the only objective criteria for the job was that an applicant be eighteen years of age and pass a civil service examination. Complainant was the top scorer on the examination. Nevertheless, her qualifications were never discussed. In fact, one of the commissioners testified that as far as he was concerned Complainant did not have any qualifications. This same commissioner, at a public meeting, pointed at Complainant and asked how she could be taken off the list. Furthermore, the record discloses that information was independently sought out with respect to the other male candidates, and not for Complainant, and that several commissioners assumed Complainant was not interested in the position. We believe this evidence substantially supports the Commission's findings and is in accordance with the law.

Therefore, we will affirm.

ORDER

AND NOW, this 20th day of December, 1988, the order of the Pennsylvania Human Relations Commission in the above-captioned matter is hereby affirmed.