542 A.2d 595

Pennsylvania State Police, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent.

Argued November 19, 1987, before Judges CRAIG and PALLADINO, and Senior Judge NARICK, sitting as a panel of three.

*Joseph S. Rengert,* Assistant Counsel, for petitioner.

*Ellen K. Barry,* Assistant Chief Counsel, with her, *Elisabeth S. Shuster,* Chief Counsel, for respondent.

OPINION BY SENIOR JUDGE NARICK, May 10, 1988:

This is an appeal by the Pennsylvania State Police (Petitioner) from an order of the Pennsylvania Human Relations Commission (Commission) which found that Petitioner had discriminated against Almando Carrasquillo (complainant) in discharging him on the basis of his national ancestry (Puerto Rican) in violation of Section 5(a) of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 74, *as amended,* 43 P.S. §955(a).

This matter was originally heard by a three-member panel appointed by the Commission. Two members of that panel issued findings of fact, conclusions of law and an opinion in support thereof, in which they concluded that the Petitioner had discriminated against Complainant. One panel member dissented. The Commission, by a five-three vote, adopted the hearing panel's conclusions. On appeal to this Court, the matter was remanded for the entire Commission to review the whole record. The Commission then reaffirmed its prior order, adopting the hearing panel's conclusions by a four-two vote.

Before discussing the issues Petitioner now raises, a review of the facts as found by the Commission would be helpful. Complainant is a white Hispanic male of Puerto Rican ancestry. He entered the State Police training academy on May 11, 1981 to begin a five-month training period. Upon graduation from the academy, he was assigned to Troop "S" in Harrisburg, an interstate patrol unit. Prior to arriving for his assignment, however, Complainant served a three-day suspension for failure to respond truthfully to questions regarding an incident of sexual misconduct committed by his roommate at the academy. Complainant arrived at Troop "S" three days after his two academy classmates who had also been assigned there. Notice of his suspension was posted on a bulletin board at the station when he arrived for duty.

After his arrival at Troop "S", Complainant successfully completed a 30-day coach-pupil training period, during which he accompanied Trooper Brenner in a patrol car, first watching Brenner perform various duties and then doing them himself. He was then assigned to regular patrol duty.

According to State Police regulations, all new troopers serve an 18-month probationary period, which

includes the five months of training spent at the academy. While on probation, troopers can be discharged for rule or other violations through a fairly informal process which involves review by a three-member Probationary Trooper Review Committee (PTRC). If a trooper's supervisor recommends dismissal, the PTRC reviews the matter, and decides whether to hold a hearing. After a hearing, the PTRC votes to retain or dismiss the individual, which decision is not appealable. (After the 18-month probationary period, a formal court-martial is necessary to dismiss a trooper).

Complainant's immediate supervisors were a battery of corporals. Above the corporals were Sergeant Barkofsky and, above him, the area commander, Lieutenant Sharpe.

The first evidence of problems Complainant was having was in January 1982, when he was counseled by Sergeant Barkofsky for the following infractions: 1) unauthorized use of personal relay (getting a ride home in a State Police vehicle), 2) unbecoming radio demeanor (use of "smart alecky" tone), 3) playing pinball while on duty and in uniform, 4) use of coarse language over troop car P.A. system, and 5) reporting late for duty on January 10, 1982.

In March 1982, Complainant received his first performance evaluation, in which he was rated "good" overall. This was true despite the fact that Complainant testified to receiving an increasing number of "discrepancy notices" during that period. (Discrepancy notices are forms used by the corporals to indicate errors in filling out reports. The notices were to be signed and returned to the issuing corporal to indicate that the corrections had been made).

In June of 1982, Sergeant Barkofsky again counseled Complainant. The violations were 1) a lack of military courtesy in displaying a negative attitude towards a su-

perior officer who had returned reports to Complainant for correction and 2) failing to comply with regulations pertaining to the proper way to indicate "not guilty" on a traffic citation. (Complainant had written "not, guilty" vertically rather than horizontally across the face of the citation). Complainant was warned at that time that further violations could result in formal disciplinary action.

Later that same month, a motorist who had run out of gas lodged a complaint against Complainant for rude treatment. The incident was investigated and the ultimate result was the issuance of a disciplinary action report on September 7, 1982.

In the interim, however, in July 1982, Corporal Lanier, in completing general performance evaluations on the probationary troopers, recommended nonretention of Complainant. Corporal Lanier concluded that

> Tpr CARRASQUILLO has a problem in conducting himself properly while performing tasks/duties as a Penna State Policeman. Tpr CARRASQUILLO has not progressed to a point whereby he could be left alone, without supervision, and perform duties routinely expected of him.

> In this officers (sic) opinion, Tpr CARRASQUILLO's efforts in trying to grasp prescribed patrol and reporting procedures have been, at best, below standards. This writer believes that Tpr CARRASQUILLO does have the capacity to understand what has been taught to him, but does not retain this information, as a whole, in carrying out functions as a state police officer. Tpr CARRASQUILLO has been argumentative, he refuses to accept constructive criticism, and he, also, attempts to circumvent reporting systems,

> It appears that Tpr CARRASQUILLO cannot accept the prescribed rules and regulation (sic) outlined by this department, simply, because he does not wish to! This writer does not recommend the retention of Tpr CARRASQUILLO.

As support for his conclusions, the corporal detailed the following four complaints or investigations of which Complainant was the subject: 1) an investigation on December 28, 1981, following which Complainant was absolved of any wrong-doing, 2) the infractions documented by the January 1982 counseling, 3) the violations for which Complainant was counseled in June 1982, and 4) the June 17, 1982 complaint of Complainant's discourteous treatment of a disabled motorist.

Petitioner's personnel department, upon receiving Corporal Lanier's general investigation report recommending non-retention, requested a more detailed report and suggested various areas of development, including statements from supervisors, magistrates before whom Complainant had appeared, and persons involved in incidents investigated by Complainant or issued citations by him. Corporal Lanier prepared a second report which included the following new information: 1) statements by Corporals Lanier and Shovlin outlining their problems with Complainant's "bad attitude", 2) a statement by Trooper Brenner which indicated that Complainant had performed satisfactorily during his coach-pupil training period, 3) a statement by Corporal Lanier that none of the five magistrates contacted would say anything negative about the Complainant's performance in court, 4) details of a poorly-conducted hit-and-run accident investigation by Complainant in April 1982, and 5) a report (dated August 31, 1982) by a fellow trooper which documented a verbal warning he had given to Complainant for speeding on July 11, 1982.

The PTRC held a hearing on this matter in November 1982. With one dissent, two committee members voted to discharge Complainant, prompting him to file a complaint with the Commission.

The Commission, in adopting the hearing panel's conclusions, found that Petitioner had treated Complainant differently from other probationary troopers not in his protected class (Puerto Rican). It found that this course of treatment began in January 1982 when he was counseled for violations in which other, non-Puerto Rican troopers were involved but not counseled. It found the more striking disparity to exist, however, in the process by which Complainant was brought before the PTRC. In comparison with other general investigation reports, the Commission found that the original report prepared by Corporal Lanier contained few details. When requested to provide additional information, Corporal Lanier's supplemental report added little new material. In addition, it appeared to the Commission that events which had occurred prior to Lanier's dismissal recommendation were thereafter resuscitated for use in bolstering the case against him. Finally, the Commission found different treatment to exist in that two troopers with records worse than Complainant's were retained. For all of these reasons, the Commission found that Petitioner had discriminated against Complainant.

In reviewing the Commission's decision, our scope of review is limited to a determination of whether there was a violation of constitutional rights, an error of law, or whether the findings of fact necessary to support the adjudication are not supported by substantial evidence. *Harrisburg School District v. Pennsylvania Human Relations Commission*, 77 Pa. Commonwealth Ct. 594, 466 A.2d 760 (1983).

In cases arising under Section 5(a) of the Act, Pennsylvania courts have long followed the analytical model established by the U.S. Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). That model, adopted by the Pennsylvania Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976), sets forth the applicable burdens of proof of the parties to a discrimination action. Generally, the complainant bears the burden of establishing a *prima facie* case of discrimination. If he does so, the burden then shifts to the employer to articulate some legitimate, non-discriminatory motive for its action. If the employer does so, the complainant is then afforded the opportunity to demonstrate that the proffered reasons were pretextual. *See McDonnell Douglas*.

Our Supreme Court recently discussed the evidentiary guidelines to be used in employment discrimination cases in *Allegheny Housing v. Pennsylvania Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987). After its analysis of the U.S. Supreme Court cases and its own decisions, it clarified the proper analytical approach that should be followed by lower tribunals, suggesting that the Commission's and, to a lesser extent, the Commonwealth Court's approach may be flawed and cause confusion for failure to properly consider an employer's non-discriminatory reasons for discharging an employee, stating:

This is because the nature of the burden that 'shifts' to the [employer] when a *prima facie* case is established is simply to produce evidence of a 'legitimate, non-discriminatory reason' for the discharge. . . . If such evidence is presented, the question for the Commission is whether, on *all* the evidence produced, the plaintiff has persuaded it by a preponderance of the evidence

that the employer intentionally discriminated against [him]. Whether the plaintiff must eliminate a certain non-discriminatory reason as part of making a *prima facie* case, or discredit the evidence of that same reason produced by the employer after plaintiff's *prima facie* case has been made, the result is the same; the plaintiff must persuade the factfinder by a preponderance of the evidence.

*Id.*, 516 Pa. at 129, 532 A.2d at 318 (citations omitted) (emphasis in original). Further, the Court stated:

It was never intended, however, that the previously described analytical method would immunize members of 'protected classes' from adverse employment decisions simply by dint of their class membership. Nothing about the Human Relations Act removes its operation from the bedrock concept of our jurisprudence that one who alleges wrongdoing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the [employer] must be heard in response. Absent a response, the 'presumption' of discrimination arising from the plaintiff's *prima facie* case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a *prima facie* case. If, however, the [employer] offers a non-discriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence pro-

duced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the [employer] offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then 'decide which party's explanation of the employer's motivation it believes.' [U.S. Postal Board of Governors v.] Aikens, 460 U.S. at 716, 103 S.Ct. at 1482. The plaintiff is, of course, free to present evidence and argument that the explanation offered by the employer is not worthy of belief or is otherwise inadequate in order to persuade the tribunal that [his] evidence does preponderate to prove discrimination. [He] is not, however, entitled to be aided by a presumption of discrimination against which the employer's proof must 'measure up'.

*Id.*, 516 Pa. at 131, 532 A.2d at 319.

In the final analysis, it is the Commission's task to weigh the evidence, both direct and circumstantial, to credit and discredit testimony, to draw inferences and make ultimate findings of fact as to whether a violation of the Act occurred.

We now consider the Plaintiff's arguments within the framework of *Allegheny Housing*. Petitioner's first argument is that the Commission erred in finding that the Complainant has established a *prima facie* case. The Commission, in adapting the elements of the *McDonnell Douglas* test to suit the facts of this case, determined that to establish a *prima facie* case, Complainant had to show that 1) he was a member of a protected class, 2) he was qualified to perform his job duties, 3) he was terminated from his position, and 4) persons not of

his protected class but otherwise comparable were not discharged. As the Supreme Court clarified in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981), the burden of establishing a *prima facie* case is not onerous.

> The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. . . . [T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.

*Id.* at 253-54.

Here, we agree with the Commission that Complainant did make out a *prima facie* case. He established his membership in a protected class, produced both documentary and testimonial evidence that his job performance was satisfactory,[1] was terminated from his position, and produced evidence to show that he was treated differently on several levels from others not in his class. As the Court recognized in *Allegheny Housing,* 516 Pa. at 130, 532 A.2d at 319:

> [I]n the interest of having the ultimate question of discrimination resolved on the merits rather than for procedural failings such as lack of specificity, given the importance of circumstantial

---

[1] Petitioner argues that Complainant also bore the burden of proving that he was the "best able and most competent" to perform his job. Because we can find no evidence of Petitioner's having raised or preserved the issue for review, we deem it to have been waived. *See* Pa. R.A.P. 1551(a).

proof in such cases, it is appropriate to the reme-
dial purpose of the Act that the prima facie case
not be an onerous one.

Accordingly, upon Complainant's having made out a
*prima facie* case, a presumption of discrimination arose
which Petitioner attempted to rebut with evidence of a
legitimate, non-discriminatory motive in discharging
Complainant.

Petitioner next argues that the Commission erred in
concluding that it failed to advance such a non-
discriminatory motive. From a careful reading of the
Commission's opinion, we are constrained to agree.[2] As
the Supreme Court reiterated in *Allegheny Housing*, the
nature of the burden which shifts to the employer to
rebut the presumption of discrimination is one of
production of evidence. If the employer offers a non-
discriminatory explanation for the dismissal, then that
presumption drops from the case. The ultimate ques-
tion then becomes whether the complainant has proven
discrimination by a preponderance of the evidence.

Here, Petitioner presented evidence to show that
Complainant had what it termed an "attitude problem."
On the one hand, he was characterized by his superiors
as an individual who disregarded the organization and
necessary standardization of Petitioner's system of re-
porting accidents, incidents and other sorts of investi-
gations. Large numbers of discrepancy notices were in-
troduced as evidence on this point. On the other hand,
Complainant was regarded as arrogant and unwilling to
accept constructive criticism. (Unlike the Commission,
we see no inherent inconsistency in characterizing
Complainant as both "lackadaisical" in his reporting

---

[2] In light of our determination on this point, we need not
address Petitioner's alternative argument raising the issue of collat-
eral estoppel.

habits and "argumentative" in the face of criticism). In addition to Complainant's supervisors' testimony, Petitioner's evidence included documentation of two incidents for which he was counseled (use of "smart alecky" tone over the radio and his lack of military courtesy in becoming involved in an altercation with a corporal who had returned a report to him for correction), and the complaint from the disabled motorist. Petitioner offered copies of its field regulation and field reporting manuals, as much of its evidence related to Complainant's violations thereof. Further, there was testimony that State Police regulations allow dismissal of probationary troopers for rule or other violations.

When this evidence is considered in light of *Allegheny Housing*, it is apparent that it was sufficient to advance a legitimate, non-discriminatory reason for Complainant's discharge. "Whether or not the evidence is ultimately deemed credible, and whether or not it ultimately withstands the weighing of all the evidence, it is indisputably sufficient to raise a question of fact as to whether the employer intentionally discriminated against the employee." *Id.*, 516 Pa. at 133, 532 A.2d at 320.

Similarly apparent is that the Commission misapprehended the nature of Petitioner's burden. The hearing panel concluded in its opinion, which the Commission adopted, that Petitioner had "failed to advance a legitimate and non-discriminatory reason for its treatment of Complainant which [was] sufficient to overcome his *prima facie* case," resulting in a violation of Section 5(a) of the Act. As was the case in *Allegheny Housing*, the Commission was therefore treating Complainant's *prima facie* case as established facts to be disproved by Petitioner. This was error. Because we cannot be certain that the Commission's factual findings were not influenced by its erroneous application of the

law, accordingly, we must remand this matter to the Commission for further proceedings.

Petitioner raises three additional issues which we will address in that they may be relevant on remand. Petitioner asserts that the Commission relied on inadmissible hearsay documents to support six crucial findings of fact, that the Commission's procedures were violative of its due process rights, and that its award of monetary damages was not based upon substantial evidence and barred by the doctrine of laches.

Complainant offered ten general investigation reports into evidence, six of which were regarding other probationary troopers who had come before the PTRC. Petitioner objected to the introduction of these reports on hearsay grounds and now argues that the Commission based six of its findings upon those reports. Of those findings, four were related to Complainant. From our review of the record, there was ample first-hand testimony from numerous witnesses to support those four findings.

The two remaining findings were based upon the reports for comparison individuals. In finding of fact number 24, the Commission found: "[n]o other probationary trooper was brought before the Probationary Trooper Review Committee on the basis of an initially inadequate recommendation which was supplemented after the fact in the manner in which the case against Complainant was." As the Commission explained in its opinion, Corporal Lanier's initial general investigation report on Complainant lacked the sort of detail contained in the comparison reports. On this point, the documents were not hearsay, in that they were not offered to prove the truth of their contents. Regardless of whether or not the comparison individuals' records and conduct were better or worse than Complainant's, the documentation of their records as probationary troopers

was generally more thorough than in the case of Complainant. For example, several of the comparison reports contained both positive and negative comments from magistrates, members of the public who had come into contact with the trooper, and the trooper's superiors. Accordingly, for the limited purpose of comparing the reports as to the type and quantity of information they contained, we see no problem with the Commission's having relied on the general investigation reports.

The same may not be said, however, for finding of fact number 25, which reads: "Troopers with worse records than Complainant's, who were not Puerto Rican, were retained." As Petitioner points out, the PTRC held hearings for the comparison individuals and thereafter decided, on the basis of all the evidence, whether to dismiss or retain each trooper. It is apparent that the Commission, in making finding of fact number 25, looked at the substantive content of the general investigation reports of W-5 and B-8. (Codes were used throughout the hearing in order to preserve confidentiality. W-5 was a white male; B-8 was a black female). This was error, particularly in light of the testimony from PTRC members that these troopers were retained for reasons not apparent from the general investigation reports themselves. The general rule in administrative hearings is, of course, that hearsay evidence, properly objected to, may not be used to support a factual finding. *See, e.g., Burks v. Department of Public Welfare,* 48 Pa. Commonwealth Ct. 6, 408 A.2d 912 (1979). Thus, it was improper for the Commission to rely upon those hearsay documents as proof of the comparison individuals' records. (We point out that our determination on this point eliminates the third of the three areas in which the Commission found differing treatment of the Complainant to exist).

Petitioner's next argument is, essentially, that various procedures before, during and after the hearing vio-

lated its right of due process. First, Petitioner alleges error in the grant of Complainant's request to sequester two of its witnesses, Corporal Lanier and Lieutenant Sharpe, during Complainant's own and its affirmative action officer's testimony. This decision, along with various rulings relating to the admission of documents and the panel's more extensive questioning of Petitioner's witnesses than those of Complainant, serves as the ground for Petitioner's general claim of bias. We have carefully reviewed the record and disagree with Petitioner's characterization. The decision of whether to allow sequestration is discretionary, as Petitioner acknowledges, *Hussar v. Unemployment Compensation Board of Review*, 61 Pa. Commonwealth Ct. 28, 432 A.2d 643 (1981), and we can find no evidence that Petitioner was hampered in his cross-examination of either witness by virtue of the absence of Corporal Lanier or Lieutenant Sharpe during their testimony.

Similarly, we find no pattern of bias, actual or implicit, in the allegedly erroneous evidentiary rulings or in the panel's questioning. Rather, we see a fact-finding body conscientiously attempting to do just that. As we stated in *Pennsylvania Human Relations Commission v. Thorp, Reed and Armstrong*, 25 Pa. Commonwealth Ct. 295, 302, 361 A.2d 497, 501 (1976):

> [w]e . . . recognize that the most critical function in the prosecution and adjudication of administrative cases is in the resolution of disputed facts because the findings of fact which result from administrative proceedings are subject to only limited appellate review. The fact finding process, therefore, must be afforded the broadest dimensions of constitutional protection.

To be sure, there were erroneous rulings, as noted above, and the panel's questions were not always relevant. Overall, however, we can discern no evidence of

the Commission's having "crossed into unconstitutional realms." *Id*.

Petitioner also claims bias by virtue of the fact that the minutes from the Commission's meeting after this Court's remand indicate that the proposed order affirming the prior decision was circulated before the votes were counted. Even assuming this to be true (these minutes are not a part of the record), the argument is wholly without merit if for no other reason than the fact that two Commission members demonstrated their independence by dissenting.

Petitioner's final argument is that the Commission's award of monetary damages is not supported by the evidence, not correctly calculated and barred by the doctrine of laches. The Commission awarded backpay to Complainant in the amount of $16,858. Simple calculation reveals that this sum was based upon his 1982 earnings of $15,209 through November 3, 1982, the date of his termination. Backpay was awarded for those months between his termination and the final date of the hearing, March 23, 1984, less the $8,982 he earned in 1983. Curiously, Petitioner argues that the Commission should have determined the amount Complainant would have earned had he not been terminated, presumably a higher amount. In addition, it argues that the Commission should have deducted the amount of unemployment compensation Complainant received. We have held, however, that "[t]he Commission's power to fashion remedies is virtually plenary and exclusive." *Albert Einstein Medical Center v. Pennsylvania Human Relations Commission*, 87 Pa. Commonwealth Ct. 145, 147, 486 A.2d 575, 576 (1985) (citation omitted). In addition, we have previously rejected the argument that the Commission is required to deduct unemployment compensation benefits from its backpay awards, *Williamsburg Community School District v. Pennsylvania Human Relations Commission*, 99 Pa. Commonwealth

Ct. 206, 212, 512 A.2d 1339, 1342 (1986), reasoning that "the back pay award serves the dual purpose of discouraging discrimination and of restoring the injured party to his . . . pre-injury status."

In addition to the backpay award, the Commission awarded prospective benefits from March 23, *1983.* This was obviously a typographical error, as March 23, *1984* was the last day of the hearing and the relevant date.

Petitioner argues that the doctrine of laches ought to bar Complainant's relief for the Commission's delay in issuing its final order, both originally and on remand. We refused to consider such an argument in *Beaver Cemetery v. Pennsylvania Human Relations Commission,* 107 Pa. Commonwealth Ct. 190, 528 A.2d 282 (1987), a case in which eight years elapsed between the filing of the complaint and the Commission hearing. As we noted therein, the doctrine operates to bar relief when "the *complaining party* is guilty of want of due diligence in failing to institute his action to another's prejudice." ' (Emphasis added.) *Id.* 107 Pa. Commonwealth Ct. at 194, 528 A.2d at 284, *citing Leedom v. Thomas,* 473 Pa. 193, 200, 373 A.2d 1329, 1332 (1977). As in *Beaver Cemetery,* the delay here was not attributable to Complainant, and we will not consider the defense of laches.

For the reasons set forth in this opinion, we vacate and remand to the Commission for proceedings consistent herewith.

## ORDER

AND NOW, this 10th day of May, 1988, the order of the Pennsylvania Human Relations Commission is vacated and the above-captioned matter is remanded for proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.