127 Pa. Commonwealth Ct. 646 (1989)
562 A.2d 940
CITY OF PITTSBURGH COMMISSION ON HUMAN RELATIONS, Joseph J. Bondi and James Cavanaugh
v.
U.S. STEEL CORPORATION.
Appeal of Joseph BONDI and James Cavanaugh.
Commonwealth Court of Pennsylvania.
Argued February 9, 1989.
Decided July 31, 1989.
Petition for Allowance of Appeal Denied March 9, 1990.
*648 David F. Weiner, Robert O. Gallo, Gallo, Weiner & Michael, Pittsburgh, for appellants.
Dawne S. Hickton, Pittsburgh, for appellee, United States Steel Corp., now USX Corp.
John Gabriel, for appellee, City of Pittsburgh Commission on Human Relations.
Before BARRY and McGINLEY, JJ., and NARICK, Senior Judge.
McGINLEY, Judge.
The City of Pittsburgh Commission on Human Relations (Commission), Joseph J. Bondi (Bondi) and James Cavanaugh (Cavanaugh) appeal an order of the Court of Common Pleas of Allegheny County (Court of Common Pleas) which reversed the findings and adjudication of the Commission and sustained the appeal of the USX Corporation (USX), formerly known as United States Steel Corporation.
Complainants Bondi and Cavanaugh, both white male printing press operators formerly employed by USX, filed complaints with the Commission on February 10, 1983, alleging sex discrimination in violation of the City of Pittsburgh Human Relations Ordinance (Ordinance), Section 659.02(a).[1] Bondi and Cavanaugh were discharged from their positions as printing press operators on December 20, 1982, as a consequence of their refusal to work mandatory overtime on December 10, 1982. Bondi and Cavanaugh *649 alleged that female employees refused overtime assignments requested by USX on December 10, 1982, and on other occasions, but their refusal did not result in termination of employment. On December 20, 1982, a public hearing was held before a Commission Hearing Panel. The Commission issued a decision on July 11, 1984, ordering reinstatement of Bondi and Cavanaugh to their former positions with back wages from the date of discharge to the date of reinstatement, including reinstatement of all employee medical, life insurance and pension benefits.
The Commission's conclusions of law which are relevant to this issue are:
1. The Complainants have met their burden of proving a prima facie case of discrimination by showing that Respondent discharged Complainants on the basis of their male sex.
2. Complainants' termination from employment for refusing overtime when female employees who similarly refused overtime were not discharged constitutes a violation of the Code, Chapter 651.02.
3. Respondent has failed to carry its burden of persuading the Commission that reasons advanced by Respondent for the differences in treatment of Complainants were for a legitimate and non-discriminatory purpose.
4. Complainants are entitled to full remedy allowed by law for the unlawful discrimination against them on account of their sex which shall include reinstatement to their positions as press operators with full back pay and employee benefits (Code, Chapter 655.06).
Opinion of the Commission, July 11, 1984, at 7.
On August 10, 1984, USX filed a statutory appeal in the Court of Common Pleas. After briefing and oral argument, *650 the Court issued a decision reversing the Commission's order. On March 9, 1988, the Court issued an opinion supporting the reversal of the Commission's decision because it was based upon legally insufficient evidence. The Commission, Bondi and Cavanaugh now appeal arguing that the Court of Common Pleas erred in reversing the decision of the Commission because the Commission's determination that USX discriminated against Bondi and Cavanaugh because of their sex was supported by substantial evidence.
USX argues that the Court of Common Pleas properly reversed the Commission's decision because it was not supported by substantial evidence. It argues also that even assuming arguendo that Bondi and Cavanaugh were discriminated against on the basis of their sex, the Commission improperly awarded back pay beyond April 1983.
Our scope of review herein is limited to a determination of whether there was a violation of constitutional rights, an error of law, or whether the findings of fact necessary to support the adjudication are supported by substantial evidence. Harrisburg School District v. Pennsylvania Human Relations Commission, 77 Pa. Commonwealth Ct. 594, 466 A.2d 760 (1983). The task of weighing the evidence, both direct and circumstantial, to credit and discredit testimony, to draw inferences and make ultimate findings of fact as to whether a violation of the Act occurred is for the Commission. Pennsylvania State Police v. Pennsylvania Human Relations Commission, 116 Pa. Commonwealth Ct. 89, 542 A.2d 595 (1988).
In employment discrimination cases such as the one before us, the charging party is first required to establish a prima facie case of discrimination. Our state Supreme Court in General Electric Corp. v. Pennsylvania Human Relations Commission, 469 Pa. 292, 365 A.2d 649 (1976) adopted the United States Supreme Court's analysis in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (a race based refusal to hire case) for establishing a prima facie case. This analysis requires a complainant to establish that: (1) he is a *651 member of a protected minority; (2) he applied for a job for which the employer was seeking applicants; (3) despite his qualifications, he was not hired; and (4) after the rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; General Electric Corp., 469 Pa. at 304-306, 365 A.2d at 655-666. This prima facie test is adaptable to accommodate differences in the nature of the discrimination alleged. Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission, 516 Pa. 124, 532 A.2d 315 (1987). "The form it takes, however, must be appropriate to its function, which is to `eliminate [] the most common nondiscriminatory reasons' for the employer's action." Allegheny Housing, 516 Pa. at 129, 532 A.2d at 318 quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).
In the case sub judice, the Commission cited Reed v. Miller Printing Equipment Division of Western Gear Corp., 75 Pa. Commonwealth Ct. 360, 462 A.2d 292 (1983) which adapted the McDonnell-Douglas test. In Reed, this Court stated:
Cases involving the alleged discriminatory discharge of an employee also serve as good examples of the need for flexibility insofar as the determination of whether a prima facie case has been made is concerned. In those cases, strict application of McDonnell-Douglas would likely prevent a complainant from satisfying his burden of proof as regards a prima facie case because the situation would, in many instances, not involve the employer's seeking of other "applicants" for the position. To obviate this problem, the courts have instead focused on whether the employer retained employees in similar circumstances as those of the complainant other than being a member of the complainant's class.
Id., 75 Pa.Commonwealth Ct. at 365, 462 A.2d at 294.
In Allegheny Housing, the Supreme Court further explained the evidentiary guidelines to be followed in employment discrimination cases:

*652 Nothing about the Human Relations Act removes its operation from the bedrock concept of our jurisprudence that one who alleges wrong doing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. Absent a response, the `presumption' of discrimination arising from the plaintiff's prima facie case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a prima facie case. If, however, the defendant offers a nondiscriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then "decide which party's explanation of the employer's motivation it believes". The plaintiff is, of course, free to present evidence and argument that the explanation offered by the employer is not worthy of belief or is otherwise inadequate to persuade the tribunal that her evidence does preponderate to prove discrimination. She is not, however, entitled to be aided by a presumption of discrimination against which the employer's proof must `measure up.' (Citations omitted.)
Allegheny Housing, 516 Pa. at 131, 532 A.2d at 319.
Thus, Bondi and Cavanaugh must initially produce sufficient evidence that, if believed, indicates that more likely than not discrimination has occurred. Allegheny Housing.
*653 In Conclusion of Law No. 1, the Commission concluded that Bondi and Cavanaugh met their burden of proving a prima facie case of discrimination by showing that USX discharged complainants on the basis of their male sex. The Commission found that from 1980 to 1983, there were eight female press operators and three male press operators, including complainants. (Finding of Fact No. 28, Opinion of the Commission at 6.) The Commission went on to conclude that USX failed "to carry its burden of persuading the Commission that reasons advanced by Respondent for the differences in treatment of Complainants were for a legitimate and nondiscriminatory purpose."[2] USX asserts that Bondi and Cavanaugh failed to establish a prima facie case of sex discrimination.
This Court in Farrell Area School District v. Deiger, 88 Pa. Commonwealth Ct. 431, 490 A.2d 474 (1985), recognized the uniqueness of a case in which the Commission has found that a white male was the victim of unlawful employment discrimination and determined the appropriate standard to apply in determining whether a complainant has made out a prima facie case:
[I]n order for a white male to establish a prima facie case of employment discrimination, he `must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.' Burdine, 450 U.S. at 253, 101 S.Ct. at 1094.
The primary reason for having Complainant establish a prima facie case is to eliminate the most obvious nondiscriminatory reasons why he was not hired. Id. at 253-54 [101 S.Ct. at 1093-94].
Johnstown Redevelopment Authority v. Pennsylvania Human Relations Commission, 124 Pa. Commonwealth Ct. 344, ___, 556 A.2d 479, 484 (1989), quoting Farrell, 88 Pa. Commonwealth Ct. at 439, 490 A.2d at 479.
*654 In Farrell, a white male, Deiger, claimed he was denied a position at a day care center on the basis of his race and his sex. Deiger successfully convinced the Commission that the circumstances surrounding a company's failure to hire him gave rise to an inference of unlawful discrimination. On appeal our Court disagreed. After review of the record the Court concluded that it was not established that Dieger and Ms. Woodbridge, the successful applicant, were treated differently by the company during the employee selection process. The Court determined that Deiger failed to meet his initial burden to establish a prima facie case. It explained:
Although Complainant had a college degree in elementary education and several more credits in early childhood education than did Ms. Woodbridge, the latter's college degree in art education did not render her unqualified. Indeed, DPW approved her as qualified to fill the position. Furthermore, a review of the transcripts of the two applicants shows that Ms. Woodbridge had the better academic record. The most that we can say, on this record and the facts that were found by the Commission, is that the applicants were differently qualified for the position which they sought.
`It has always been the rule that an employer may be selective about the persons he employs as long as he does not unlawfully discriminate among the applicants.' Philadelphia Electric Co. v. Pennsylvania Human Relations Commission, 68 Pa. Commonwealth Ct. 212, 227, 448 A.2d 701, 708 (1982) (emphasis in original).
Johnstown Redevelopment Authority, 124 Pa.Commonwealth Ct. at 344, 556 A.2d 479 (emphasis in original) (quoting Farrell, 88 Pa. Commonwealth Ct. at 440, 490 A.2d at 479).
On December 10, 1982, the department group leader requested all of the press operators to work mandatory overtime and all of the printing and duplicating department press operators complied except Bondi and Cavanaugh and a female press operator, Debbie Salera (Salera). (Findings *655 of Fact Nos. 7 and 10, Opinion of the Commission, July 11, 1984, at 3-4.) The record indicates that Salera was not discharged for her failure to work overtime. In her case, when she was requested to work overtime, she stated she had a standing doctor's appointment. As a result she was excused. (Notes of Testimony, December 20, 1982, (N.T.) at 187 and Finding of Fact No. 10.) The Commission found that Bondi's refusal was due to his wife's illness and a scheduled class in school. (Finding of Fact No. 13.) USX denies that Bondi stated he had a sick wife and a scheduled class on December 10, but the Commission's hearing panel stated that it accepted Bondi's version. (Commission's Opinion at 11.) We must defer to the Commission's credibility determination. Pennsylvania State Police. Frank Stambol (Stambol), Supervisor of the printing and duplicating department of USX, testified:
Q. What happened with Mr. Bondi?
A. Mr. Bondi came into my office and I repeated the same statement to Mr. Bondi. Mr. Bondi stated I'm not working and I repeated it the second time and Joe said I have school which I was aware of.... I said to Joe I'm not attempting to threaten you, but this could cost you your job. Joe's only reaction to me was overtime, who needs it.
N.T. at 196-197.
Bondi testified that:
Q. Could you tell us in your own words what happened on December the 10th, 1982?
A. Approximately 3:30 in the afternoon, my group leader, Evelyn Burlett, came around as she normally does when there is an overtime job and said would you like to work overtime and I said no. No, thank you. Nothing was  I never gave it any more of a thought.
Near five o'clock, I believe it was her that also came over and told me that the boss wanted to see me.... He said, is it true that you're telling Evelyn that you don't want to work. I said, no, I can't. I told him that I had school. He knew that I had a lot of schooling. I was *656 going to school fulltime. My wife was sick. And at that point, he said that the company is more important than your family. And he started to get pretty irate with me and he told me  he says, are you still saying you can't....
N.T. at 83.
This testimony supports Bondi's allegations of disparate treatment on behalf of USX and provides substantial evidence to support the Commission's finding that Bondi was terminated under circumstances which give rise to an inference of discrimination. USX offered no evidence or testimony relating to the nature, and perhaps, even the urgency, of Salera's scheduled doctor's appointment. Nor, is there any testimony or evidence to indicate that Bondi was aware that Salera could not work or that USX could not excuse any more press operators because it excused Salera. USX has not offered a non-discriminatory and legitimate motive for its action. Absent this response, Bondi's prima facie case stands determinative of the factual issue. Allegheny Housing.
Cavanaugh's circumstances are different because he offered no excuse for refusing to work overtime. Stambol testified:
Q. What did you tell him?
A. I had told Mr. Cavanaugh that we've got a voluminous printing job that's got to be completed this weekend. We have to work this evening and straight through the weekend. Mr. Cavanaugh said I'm not working. I said, Jim, this is something that has to be. We've got to get this done this weekend. He said, I'm not working. Before I repeated it the third time, I stated to Mr. Cavanaugh, I'm not attempting to threaten you, but this could cost you your job. He said, I'm not working. That was the extent of the conversation with Mr. Cavanaugh.
N.T. at 196-197.
At hearing, Cavanaugh testified:

*657 The Witness: ... There was an overtime situation on the 10th of December where in this particular situation I think everyone in the department was asked to work.... I refused to work.... I declined and didn't think anything of it. Just figured well, I'm not going to stay.... I just plain old declined, not figuring there would be any follow-up as far as punishment....
N.T. at 31-33.
Q. On December 10, 1982 did you ever give anyone a reason as to why you could not work overtime?
A. No, I did not. I was not asked either.
N.T. at 42.
Cavanaugh's situation can be compared to that of Cindy Francisco (Francisco), a female collating employee, not a press operator, who refused to work overtime on Friday and Saturday. She also failed to work overtime on Sunday because of illness although she had previously agreed to work on Sunday.[3] Francisco was not terminated for her refusal. USX argues that Francisco was not similarly situated to Bondi and Cavanaugh, who were press operators. The work in question, USX asserts, required printing press operators to perform their function prior to collating the documents placing Francisco in a different situation.[4] The Commission was not convinced.[5] The collating section *658 is a subpart of USX's printing and duplicating department. (N.T. at 45.) At hearing, complainants offered Francisco's testimony that on Friday afternoon Ruth Russell (Russell), control clerk of the department, asked her to work overtime that weekend, and Francisco refused. Russell called Francisco at home that same evening and Francisco told Russell that she could not come in Saturday but would come in Sunday. Francisco testified that Russell stated that "you may not have a job on Monday if you don't work." (N.T. at 61.) Francisco offered no reason for not being able to work. (N.T. at 67.) On Sunday, Francisco called Russell and informed her that she was ill and would not make it to work that day. (N.T. at 62.) Francisco testified that when she returned to work on Monday she was not disciplined for not working overtime. (N.T. at 62.) Francisco testified:
Q. Isn't it true that in the kind of work that went on that weekend, there was no work for bindery machine operators until after the printing presses had run for awhile?
A. Well, usually you had to wait until the presses got you work to collate but they were  we were asked to stay to do work in collating.

. . . . .
Q. To the best of your knowledge, did any other bindery machine operators work on Friday night?
A. When I left at five o'clock there were other people there, yes.
Q. Were there any bindery machine operators?
A. Yes.

. . . . .
Q. Do you know how many hours they worked on Friday night?
A. No. They ended up not working. After I had gone home, they told them to go home.
N.T. at 63-64.
USX reasons Francisco was not disciplined because the bindery machine operators ended up not working Friday *659 evening. Evelyn Burlett (Burlett), group leader of the press operators, testified that the press job was completed Saturday afternoon and that "a few collators [sic] came in" on Saturday. (N.T. at 142.) Russell testified that Francisco co refused to work Saturday. Russell stated she had taken instructions from Stambol and informed Francisco that if she refused the overtime Stambol would meet with her Monday to discuss whether or not she would still have a position. (N.T. at 177-178.)
The Commission's Finding of Fact No. 14[6] is supported by substantial evidence. The fact that the collaters were not needed, or may not have been required to work Friday evening, is irrelevant. USX requested Francisco to work the weekend. She refused to work on Saturday, when the collaters were needed. Francisco was not terminated for her refusal, but Cavanaugh was.
We must also compare Francisco's circumstances to those of Bondi. Francisco was not terminated for her refusal to work on Sunday. USX argues Francisco called in ill that morning. Bondi was terminated for his refusal to work overtime. He informed USX that his wife was ill and that he had a scheduled class.
Because of this disparate treatment both complainants have proven by a preponderance of the evidence that they were terminated under circumstances which give rise to an inference of unlawful discrimination.[7]Farrell. Furthermore, USX has failed to provide a legitimate, non-discriminatory motive for its action. Allegheny Housing. The *660 Commission found that USX's 1982 written job evaluations rated Bondi and Cavanaugh as exceeding qualifications of the job. (Finding of Fact No. 29, Opinion of the Commission at 6.) Stoddard Burg (Burg), general manager of accounting services at USX, testified that he had the sole authority to terminate employees in his department. (N.T. at 236.) Burg testified:
Q. When was the first time that you met Mr. Bondi and Mr. Cavanaugh?
A. The first time I met Mr. Cavanaugh was on December 17, 1982 in my office at approximately five o'clock. It was a Friday. My first conversation with Mr. Bondi  I did not meet him. It was over the telephone on the same day about the same time.
Q. When did you first learn of the problem concerning Mr. Bondi and Mr. Cavanaugh?
A. When I returned from a trip out of town. I returned on Thursday, December 16th and I was in the office early Friday, December 17th. My secretary informed me that I had an urgent message to contact Mr. Stambol.
Q. What did Mr. Stambol tell you?
A. He came to my office and related the the incidents which had occurred on the preceding Friday essentially as he has related them in his testimony.
N.T. at 232-233.
The testimony reveals that Bondi and Cavanaugh were terminated solely for their refusal to work overtime that weekend:
BY MR. WEINER:
Q. Mr. Burg, when the situation with Mr. Bondi arose, did you ask Mr. Stambol about what kind of performers they were?
A. That was not an element in my decision; and therefore, there was no need.
Q. You didn't answer the question. Did you ask Mr. Stambol about  you said you knew nothing about Mr. Bondi and Mr. Cavanaugh. They were merely names to you. Did you ask Mr. Stambol who these people were?

*661 . . . .
Q. Are you saying for the record you did not ask Mr. Stambol about what kind of performers Mr. Bondi and Mr. Cavanaugh were?
A. That is correct.
Q. Did you ask Mr. Stambol to take a look at their appraisal, you wanted to see their appraisals?
A. I had their appraisals in front of me.
Q. Did you scrutinize their appraisals?
A. I did indeed.
Q. What did you find on their appraisals?
A. They both exceeded requirements.
N.T. at 247-249.
USX provided no non-discriminatory distinguishable reason for terminating Bondi and Cavanaugh and not terminating others similarly situated.[8] In fact, counsel for USX made an offer of proof to introduce evidence consisting of a productivity study of its press operators, but only as it related to the back pay issue:
MS. SYMONS: I would like to make an offer of proof at this time as it is now my case in chief and I am allowed to introduce evidence concerning matters which would curtail their ability to receive a back pay award if they were to be awarded back pay. This is a proper element of my case and I would like to offer an offer of proof on this matter because I think it is an important element that goes to an important element of this case.
COMMISSIONER WELLONS: Ms. Symons, if you're going to offer the information related to layoff and related to back pay issue kind of thing, then, yeah, of course. Yes, of course, we'll accept it but only to that degree. . . .
MS. SYMONS: That's the only basis I was offering it.
N.T. at 237-238.
USX last argues that if the Court of Common Pleas' order is not affirmed, the Commission improperly awarded *662 Bondi and Cavanaugh back pay. USX argues that the Commission erred as a matter of fact and law by failing to consider the burden of Bondi and Cavanaugh to mitigate damages and by ignoring the evidence that a force reduction occurred on April 20, 1983, which eliminated the positions that would have been held by Cavanaugh and Bondi. USX asserts that the back pay award must be limited to the time period of December 20, 1982, the date of complainants' termination, to April 20, 1983, because the least senior and least productive employees would have been laid off on April 20, 1983. (N.T. at 243-244; Original Record, Exhibit 1, USX's productivity study dated March, 1983.)
Complainants argue that even if, for argument sake, Cavanaugh and Bondi would have been laid off in April of 1983, they would have been entitled to receive severance pay and/or unemployment compensation which had been denied to them by USX after they were terminated. (N.T. at 281.)
Section 655.06(c) of the Ordinance provides in pertinent part:
If upon all evidence presented the Commission finds that the respondent has engaged . . . in an unlawful practice, it shall state its findings of fact in writing and shall issue such order in writing as the facts warrant to effectuate the purposes of this article. Such order may require the respondent to cease and desist from such unlawful practice and to take such affirmative action including, but not limited to, the hiring, reinstatement, or upgrading of employees, with or without back pay . . . as, in the judgment of the Commission, will effectuate the purposes of this article and are warranted by the facts presented at the hearing, including a requirement for reports of the manner of compliance.
Pittsburgh Code, Section 655.06(c).
We acknowledge that the Commission acted under the Ordinance, which applies to discriminatory practices *663 which occur within the territorial limits of the City of Pittsburgh.[9] Although Section 655.06(c) of the Ordinance is applicable, the City modeled this back pay provision after Section 9(f) of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, as amended, 43 P.S. § 959(f). It is well established that the Commission is authorized under Section 9(f) of the Act to award damages when it finds, based upon evidence presented at a hearing, that a respondent has engaged in an unlawful discriminatory practice. Judicial discretion may not be substituted for administrative discretion, absent bad faith, fraud, capricious action or an abuse of power by an administrative agency. Thomas v. Pennsylvania Human Relations Commission, 106 Pa.Commonwealth Ct. 598, 527 A.2d 602 (1987). The Commission granted complainants the full remedy allowed by the Ordinance, reinstatement to their employment as press operators, or other comparable position; back pay from the date of discharge; and reinstatement of all employee benefits provided to complainants. The Commission rejected USX's argument that Bondi and Cavanaugh are only entitled to back pay for the period of April 30, 1983, because the lay-off determination was made after the discharge of complainants and was based on a March, 1983 productivity study. (Commission's Opinion at 12.) The Commission did not abuse its discretion.
There being substantial evidence to support the Commission's decision, we reverse the order of the Court of Common Pleas and reinstate the Commission's order.

ORDER
AND NOW, this 31st day of July, 1989, the order of the Court of Common Pleas of Allegheny County dated December *664 14, 1987, at No. S.A. 1025 of 1984, is hereby reversed and the order of the Commission reinstated.
SMITH, J., did not participate in the decision in this case.
NARICK, Senior Judge, concurring and dissenting.
I concur in affirming the Commission's decision that the Employer unlawfully discriminated against Bondi and Cavanaugh (Complainants). I dissent and would remand to the Commission directing the parties to submit additional objective evidence on the proper termination date for back pay purposes, the efforts of the Complainants to mitigate the damages during the established back pay period and their interim earnings, if any, to be deducted from the gross back pay during the back pay period. The Commission ordered reinstatement to their former positions as press operators or other comparable positions with back pay from the date of discharge without setting forth the amount of back pay or cut-off date for back pay purposes, and the reinstatement of all employee benefits to the Complainants.
The City's ordinance is modeled after Section 9(f) of the Pennsylvania Human Relations Act (PHRA), Act of October 27, 1955, P.L. 744 as amended, 43 P.S. § 959(f). Based on the Pennsylvania Human Relations Commission's decisions and its well-established practice relating to back pay awards, the Commission is undoubtedly aware of those decisions that interim earnings are deductible from back pay awards, see Pennsylvania Human Relations Commission v. Transit Casualty Insurance Co., 20 Pa.Commonwealth Ct. 43, 340 A.2d 624 (1975), aff'd, 478 Pa. 430, 387 A.2d 58 (1978) (the deduction of interim earnings from gross back pay), and back pay awards are reduced or disallowed for failure to mitigate damages, see Albert Einstein Medical Center v. Pennsylvania Human Relations Commission, 87 Pa.Commonwealth Ct. 145, 486 A.2d 575 (1985) (in which the Commission halved the back pay award after finding discrimination based on the Complainants' failure to mitigate damages in failing to exercise reasonable diligence *665 in seeking employment). The Commission's refusal to consider the mitigation of damages question and permit evidence, if any related thereto, was, in my view, an abuse of discretion.
The purpose of the ordinance herein, following the lead of other national and state non-discrimination legislation, is as stated by Justice O'Connor in Ford Motor Co. v. Equal Employment Opportunity Commission, 458 U.S. 219, 230, 102 S.Ct. 3057, 3064, 73 L.Ed.2d 721 (1982), a Title VII case, "`"to make the victims of unlawful discrimination whole"' by restoring them, `"so far as possible . . . to a position where they would have been were it not for the discrimination."'" (Citations omitted.)
SMITH, J., did not participate in the decision in this case.
NOTES
[1] This section provides in pertinent part:

It shall be unlawful employment practice....
(a) For any employer to refuse to hire any person or otherwise to discriminate against any person with respect to hiring, tenure, compensation, promotion, discharge or any other terms, conditions or privileges directly or indirectly related to employment because of race, color, religion, ancestry, national origin, place of birth, sex, age, non-job related handicap or disability.
Pittsburgh Code, Section 659.02(a).
[2] Conclusion of Law No. 3, set forth herein.
[3] Finding of Fact No. 11. (See N.T. at 61-64.)
[4] Frank Stambol, Supervisor of the Printing and Duplicating Department of USX, testified:

Q. Why was Ms. Francisco not disciplined or terminated for failing to work on Sunday?
A. She is in my collater section. I had four collaters. One was totally inoperable. That left me a balance of three operating machines. We had summoned and received the help of three operators. I had a full complement in collating for that weekend. I did not need Cindy Francisco.
N.T. at 203.
[5] The Commission's Finding of Fact No. 18 provides:

18. Debbie Salera nor Cindy Francisco were terminated from their positions for refusing to work overtime since their refusal did not cause a delay in Respondent completing the assignment (Tr. 36; 186-187; 209-210).
Commission's Opinion at 5.
[6] Finding of Fact No. 14:

14. Although the press operators were required for the December 10th overtime, Complainants were not afforded the option of working Saturday, December 11th and/or Sunday, December 12th overtime as allowed to Cindy Francisco (Tr. 90).
Commission's Opinion at 4.
[7] Testimony was also presented regarding odd jobs performed by male employees which were not required of female employees. The tasks involved carrying equipment cleaning fluid containers, loading paper on shelves, and various other odd jobs. In its decision, however, the Commission stated it was unpersuaded that Bondi's and Cavanaugh's performance of odd jobs constituted a pattern of sex discrimination. (See Opinion of the Commission at 10.)
[8] At hearing, Stambol and Russell testified that Francisco was informed that she might not have a job if she refused to work overtime. Francisco was never disciplined.
[9] Section 651.03 of the Ordinance provides:

This article applies to discriminatory practices, including but not limited to discrimination in employment, housing and public accommodations, which occur within the territorial limits of the City, and to employment contracted for, performed or to be performed within these limits, and to places of public accommodations, resort, recreation and amusement located within the City limits.
Pittsburgh Code, Section 651.03.