Robert R. CUMMINGS, Appellant

v.

The COMMONWEALTH of Pennsylvania, STATE SYSTEM OF HIGHER EDUCATION, Bloomsburg University, a/k/a Bloomsburg University of Pennsylvania of the State System of Higher Education.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 9, 2004.

Decided Nov. 1, 2004.

Matthew A. Cartwright, Wilkes–Barre, for appellant.

Francis R. Filipi, Harrisburg, for appellees.

BEFORE: SMITH–RIBNER, Judge, and COHN JUBELIRER, Judge (P), and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Robert R. Cummings, D.Ed., (Cummings) appeals from an order of the Court of Common Pleas of the 26th Judicial District (Columbia County Branch) (trial court) denying his post-trial motion for a new trial or for judgment notwithstanding the verdict. Cummings' motion followed the trial court's ruling that Bloomsburg University did not unlawfully discriminate on the basis of sex when it offered Cummings a one-year position as assistant professor, as opposed to a tenure track position.

In 1998, Cummings filed a complaint[1] against the Commonwealth of Pennsylvania, State System of Higher Education, Bloomsburg University of Pennsylvania (the University) in which he asserted that the University discriminated against him on the basis of his gender, in violation of Section 5 of the Pennsylvania Human Re-

---

1. After the Pennsylvania Human Relations Commission declined to pursue Cummings' claim of sex discrimination, it issued Cum- · mings a right to sue letter. Shortly thereafter, on February 19, 1998, Cummings initiated this action.

lations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955.[2] Cummings alleged that in 1994 the University did not offer him a tenure track position as student teacher supervisor because at the time the University was under threat of a sex discrimination law suit from several female job applicants. Cummings sought the following relief: a tenure track position at the University; compensatory damages for lost wages and benefits as well as for non-economic losses; punitive damages; and attorney fees. The University denied Cummings' allegations and contested his right to any relief.

In February of 2003, the trial court conducted a four-day trial at which it found the following material facts. In 1994, the University's Department of Curriculum and Foundations (Department) advertised openings for four tenure track assistant professor positions. The Department formed a faculty search and screen committee (Search Committee) to screen the applications and to coordinate candidate interviews. Interviews of the screened applicants were conducted by the (1) Search Committee, (2) Department faculty not serving on the Search Committee, (3) the Chairperson of the Department, Dr. William O'Bruba (Department Chair), and (4) the Dean of the College of Professional Studies [3] (Dean), Dr. Howard K. Macauley. The process then called for the Department Faculty to vote on those interviewed and recommend a candidate to the Dean. If the Dean agreed with the vote, he would recommend that candidate to the Provost, who, in turn, would then recommend the candidate to the University President. Neither the Dean nor the Department Chair had the authority to offer a position to an applicant; hiring was the responsibility of the University President.

On August 18, 1994, Cummings was interviewed along with two other candidates, Dr. Carol Hodes and Dr. Mary Ann Rudy.[4] Cummings did not fare well in his interview with the Dean, who found that Cummings lacked an established record of scholarship and failed to express an interest in future scholarly growth. Specifically, Cummings presented no evidence of grant writing experience, delivering papers to peers or making other contributions to professional organizations. On the day of

---

2. This section provides in pertinent part as follows:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
>
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 P.S. § 955(a).

3. The Department was part of the College of Professional Studies.

4. The advertisement yielded nine applicants. Cummings applied for two positions. Initially, the Search Committee did not select him for an interview for either position. When the first round of interviews did not result in a hire, a second round of interviews was undertaken. This time, Cummings was selected for interview for the student teacher supervisor position.

Cummings' interview, the Dean shared his concerns with the Department Chair, who agreed with the Dean's assessment of Cummings' qualities as a scholar. However, the Department Chair reminded the Dean that Cummings was retired from the public school system, where scholarship was not expected as it was in a university position. The Department Chair also informed the Dean at their August 18, 1994, meeting that Cummings had been the Search Committee's third choice for interview because his credentials were not as strong as the first two candidates.

On about August 23, 1994, Cummings received a majority vote of the Search Committee. The Department Chair left a telephone message for Cummings that he was being recommended to the Dean for a position. Cummings testified that the message extended an offer, but the Department Chair specifically denied this, stating that he had no authority to offer Cummings the position.[5]

On August 23, 1994, while deliberations were on-going with respect to the three candidates for the student teacher supervisor position, Dr. Louise Wachter complained to the newly appointed President of the University, Jessica Kozloff, that the Search Committee had treated her "shabbily" during her interview.[6] Trial Court Opinion at 5. The following day, Dr. Wachter made the same complaint to the Dean. As a result, the Dean requested the Search Committee to re-interview Dr. Wachter and Dr. Hodes in a more professional manner.

On August 25, 1994, the Dean learned of the Search Committee's vote to recommend Cummings. In response, the Dean advised the Department Chair that he would not recommend Cummings for a tenure track position. Nevertheless, in light of the fact that students were scheduled to arrive on campus within a few days, the Dean requested the Department Chair to contact Cummings to see if he would be willing to accept a one-year appointment, assuming the Provost would agree to convert the tenure track position to a temporary appointment. This would meet the Department's immediate need for a student teacher supervisor and would give Cummings the opportunity to develop as a scholar. If he showed this development, Cummings would be considered for a tenure track position the following academic year. That day, the Department Chair offered Cummings these terms, and he initially accepted them.

On August 26, 1994, Cummings informed the Department Chair that he was no longer interested in a temporary position. Accordingly, the Dean directed that another candidate, Dr. Hodes, be contacted; Dr. Hodes was the sole candidate remaining from the August 18, 1994, interview. The members of the Search Committee refused to recommend Dr. Hodes, and the University Provost declared the search to have failed. The position was re-classified as a one-year position. Thereafter, the University selected the most qualified, available candidate, Dr. William Francis Keating, who accepted the position on a temporary basis and subsequently became a tenured professor.

Based on these findings, the trial court concluded that the University demonstrat-

---

5. Cummings testified that he was unaware until the hearing that the Department Chair did not have the authority to offer him a job.

6. Dr. Wachter complained that one member of the Search Committee was eating during her interview, another was slouched and, at the conclusion of the interview, no one escorted her to the door. Later in the day she observed another candidate being escorted to the door.

ed a legitimate, non-discriminatory basis for not hiring Cummings for a tenure track position, *i.e.*, Cummings' deficiencies as a scholar. Because Cummings failed to present evidence sufficient to prove discrimination by a preponderance of the evidence,[7] the trial court entered judgment in favor of the University. Thereafter, Cummings' requests for post-trial relief were denied, and this appeal followed.

On appeal, Cummings asserts that the evidence, taken as a whole, does not support the trial court's judgment in favor of the University. Cummings maintains that the University's stated reason for not offering him a tenure track position, lack of scholarly growth, was pretextual. It was offered only to mask its real reason, which was Cummings' gender. Cummings contends that his application was reviewed in the midst of "upheaval [in the University that] manifested itself in the form of animosity between men and women who were existing professors in that Department" and it was "not a good time to hire men." Cummings' Brief at 8, 10. Cummings maintains that his evidence showed that the University's explanation for not hiring him was "festooned with inconsistencies" and, thus, was not plausible. Cummings' Brief at 10. Accordingly, Cummings requests this Court to reverse the trial court's denial of his post-trial motions.

 The burden is high upon one who seeks to reverse a trial court's decision to deny a request for a new trial or for judgment *non obstante verdicto* (n.o.v.). A new trial will be granted only if the trial court abused its discretion or committed an error of law that controlled the outcome of the case. *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 841 (Pa.Super.1999). An abuse of discretion will not be found merely because the appellate court might have reached a different conclusion; it requires a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous. *Paden v. Baker Concrete Construction Co., Inc.*, 540 Pa. 409, 658 A.2d 341 (1995). A judgment n.o.v. should only be entered in a clear case, with any doubt resolved in favor of the verdict winner. *Moure v. Raeuchle*, 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).[8] A judgment n.o.v. is appropriate where the evidence, and all inferences drawn therefrom, viewed in the light most favorable to the verdict winner is insufficient to sustain the verdict. *Kiker*, 742 A.2d at 1085.[9]

 With these principles in mind, we consider whether the trial court committed an error of law that would have changed

---

7. The trial court noted that although the University contended that Cummings did not meet the requirements for the tenured position, the University conceded that Cummings made a *prima facie* case of discrimination and that he was at least minimally qualified for the position for which he applied.

8. "When reviewing a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact. Any conflict in the evidence must be resolved in the verdict winner's favor." *Fanning v. Davne*, 795 A.2d 388, 392 (Pa.Super.2002) (quoting *Kiker v. Pennsylvania Financial Re-*

*sponsibility Assigned Claims Plan*, 742 A.2d 1082, 1084 (Pa.Super.1999)). A judgment n.o.v. may be entered where (1) the moving party is entitled to judgment as a matter of law or (2) the evidence is such that no two reasonable minds could disagree that judgment was due to the moving party. *Eichman v. McKeon*, 824 A.2d 305, 311 (Pa.Super.2003).

9. Where credibility and the weight to be accorded the evidence are at issue, the appellate court will not substitute its judgment of that of the factfinder. *Cruz v. Northeastern Hospital*, 801 A.2d 602 (Pa.Super.2002).

the outcome of the case and whether the evidence was insufficient to support the trial court's judgment in favor of the University. This requires that we identify the elements of an unlawful sex discrimination case and whether Cummings' evidence, viewed most favorably to the University, satisfied those elements.

■ Our Supreme Court has adopted the federal analytical model established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for considering whether an employer has engaged in unlawful discrimination. *Allegheny Housing Rehabilitation Corporation v. Pennsylvania Human Relations Com'n*, 516 Pa. 124, 532 A.2d 315 (1987).[10] The federal model for allocating the order of presentation and burden of proof is as follows:

> The complainant in a Title VII[11] trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifica-

tions. ... *The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection* .... [The complainant] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision.

*McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 805, 93 S.Ct. 1817 (emphasis added). An employer rebuts the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[12] The employer need not persuade the court that it was actually motivated by the proffered reasons. "[T]he employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.' " *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (quotations omitted).

■ In the present case, the University conceded that Cummings established a *prima facie* case on the basis of gender under the *McDonnell Douglas* model.

---

10. *Allegheny Housing* was brought under Section 5(a) of the Pennsylvania Human Relations Act, Act of October 21, 1955, P.L. 744, *as amended*, 43 P.S. § 955(a), but both the Pennsylvania Human Relations Commission and this Court followed the analytical model developed by the United States Supreme Court in *McDonnell Douglas* for cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, which was first approved for employment discrimination cases under the Pennsylvania Human Relations Act in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976).

11. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17.

12. In *Burdine*, wherein the plaintiff asserted she was terminated because of her sex, the Supreme Court confirmed the *McDonnell Douglas* analytical model. Establishment of the *prima facie* case creates a rebuttable "presumption that the employer unlawfully discriminated against the employee" and eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089.

The University made this tactical decision because it believed that "the *prima facie* burden has been so reduced" in sex discrimination cases that anyone can satisfy it, noting that, in truth, every plaintiff is a member of one gender or the other. University Post–Trial Brief at 8. Accordingly, the University chose to defend against Cummings' charge of discrimination by demonstrating that it had a legitimate, non-discriminatory reason for not offering Cummings a tenure track position. The University had only to raise a genuine issue of fact about whether it discriminated against Cummings in order to prevail. *See Board of Trustees of Keene State College.*[13] The fact that Cummings made out a *prima facie* case did not relieve him of the burden of persuasion.[14] The Human Relations Act did not alter the bedrock legal principle that one who alleges wrongdoing must supply the proof. *Allegheny Housing,* 516 Pa. at 131, 532 A.2d at 319.

Once the University proffered a legitimate reason for its employment decision, it became Cummings' burden to prove the reason was false. He tried to do so by showing that the University's explanation was unworthy of credence and that Cummings' gender more likely explained the University's decision. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817. Indeed, Cummings believes that his evidence showed that the trial court's verdict in favor of the University bore no rational relationship to the evidence. Stated otherwise, "no two reasonable minds" could dis-

agree on this point. *Eichman,* 824 A.2d at 311.

The first inconsistency identified by Cummings relates to the Dean's reason for not offering Cummings a tenure track position. Cummings maintains that the terms for the student teacher supervisor position were revised only after the Dean learned of Dr. Wachter's complaints on August 24, 1994. Dr. Wachter was interviewed on August 2, 1994, and for a different position than Cummings. On August 12, 1994, Dr. Wachter was advised that she was not recommended for the position, and a male applicant was selected. On August 23, 1994, Dr. Wachter met with the University President; the next day she met with the Dean. At the end of August 1994, Dr. Wachter filed a complaint with the Human Relations Commission, and as of the date of her testimony on February 24, 2003, her discrimination case against the University was still pending. This chronology of events does not contradict the Dean's statement that he made his decision on August 18, 1994, that Cummings was not qualified for a tenure track position.

Next, Cummings maintains that the University's treatment of another male professor, Dr. Raymond Pastore, during the relevant time period corroborates Cummings' theory that it was a bad time for male applicants. Dr. Pastore was a candidate for a different position, who was recommended by the faculty. On August 25, 1994, his position changed from tenure

---

**13.** In producing evidence of its legitimate reason, the University simultaneously rebuts Cummings' *prima facie* case and frames the factual issue so that Cummings can then show that the proffered reason was a pretext. *Burdine,* 450 U.S. at 255–56, 101 S.Ct. 1089.

**14.** The *McDonnell Douglas* model does not shift the ultimate burden of persuading the trier of fact that the employer's motives were

*not* unlawfully discriminating upon the employer. It is not intended to immunize members of "protected classes" from adverse employment decisions *not* based on their class membership, protection not enjoyed by others and not granted by the Pennsylvania Human Relations Act. *Allegheny Housing,* 516 Pa. at 131, 532 A.2d at 319. Cummings is not a member of the recognized protected class.

track to a one-year temporary position. On September 7, 1994, the Dean stated to Dr. Pastore that the position was altered because two women were threatening to sue the University for improprieties in the hiring search.[15] The trial court held that whether gender motivated another personnel decision of the University was irrelevant to whether it was the motivation in Cummings' case. This finding is reasonable.[16]

Cummings next attacks the University's explanation by arguing that "scholarly growth" was not required in previous hires. Further he contends that the Dean's complaint about Cummings' lack of publication was a "fabrication."

In support, Cummings notes that Dr. Bonita Franks, a Department faculty member, was hired and then later promoted in 1991 to associate professor notwithstanding her lack of publications. Dr. Paulette Monchak was offered a job in August 1994 even though she did not have a track record of publications, as incorrectly asserted by the Dean at the hearing. Finally, in August 1994, Dr. Richard Graffius was offered a tenure track position even though his sole contribution to published scholarship was "The Official Punxatawney Phil Coloring Book."

Cummings' evidence about other personnel determinations, however, did not render the University legitimate, nondiscriminatory reason implausible. There are many explanations for Dr. Franks' promotion. She may have demonstrated a commitment to scholarship in one of the other ways identified by the Dean; it may also be that by the time Cummings was seeking employment, the University decided to demand more of those seeking a tenure track position. The Pennsylvania Human Relations Act does not bar an employer from raising its standards for employment. The Dean erred in his recollection of whether Dr. Monchak had published, but many years and his retirement had intervened between the events and his testimony about them. It appears the Dean was simply mistaken in his belief that Dr. Monchak had published, but it does not mean that the publication standard was "fabricated" for this litigation. Cummings delights in lampooning the Dean's claim that a coloring book constitutes a scholarly publication. However, Dr. Graffius was seeking employment in the University's educational curriculum department not its physics department. More to the point, the Dean was clear in his recollection, presented under oath, that Dr. Graffius had expressed a commitment to scholarly growth and that Cummings had not. In any case, the Dean never claimed that a history of publications was the *sine qua*

---

**15.** The testimony was inconsistent on this point. Nevertheless, the Dean was found to have made this remark to Dr. Pastore.

**16.** The trial court also found irrelevant Cummings' evidence regarding gender tensions within the Department. Certain male Department faculty claimed that activist female faculty members, whom they termed "feminazis," voted as a block in favor of female candidates. On the other hand, female faculty members believed the Search Committee's behavior was sexist. Because the Dean requested a re-interview of Dr. Wachter and Dr. Hodes, an emergency faculty meeting was called on September 6, 2004. One of Cummings' witnesses, a tenured male faculty member, claimed that he was "muzzled" at the September meeting by the Dean, who denied the charge. The trial court found the faculty member's testimony incredible in light of other evidence that it is nearly impossible to terminate a tenured professor. In any case, the Dean did not learn of the cross-allegations of sexism by Department faculty members until September 1, 2004, *after* Cummings announced his refusal to consider a temporary appointment.

*non* of scholarship. He explained that scholarly growth included publications as well as a contribution to professional organizations and participations in other opportunities for peer review.

The trial court found that the Dean and the Department Chair both identified weaknesses in Cummings' credentials and development as a scholar. The Department Chair subsequently voted with the Department Faculty to recommend Cummings. This vote did not mean that his concerns about Cummings' candidacy expressed one week earlier to the Dean were unfounded. The Dean's recollection of the August 18, 1994, conversation with the Department Chair was not confirmed by the Department Chair. However, the Department Chair explained that nine years after the events in question, he could not precisely recall what was said. By contrast, the Dean's memory of the August 18, 1994, conversation was clear. The trial court found, as is the prerogative of the factfinder, that the Dean's recollection was credible.

The Dean expected Cummings and the other candidates to demonstrate scholarly achievements or an intention to pursue such activities at the University, should they be appointed.[17] Cummings admitted that he did not address his professional and academic accomplishments, in any detail, either in his application or in his interview. Cummings asserted that he was unaware of the need to address the issue even though it had been so stated in the advertisement to which he responded. Cummings also testified that he wanted to get a job at a college or university near his home where he could "earn probably less than $50,000" but would have the summers off and less stress—what he termed "bigger breaks." R.R. 658a–659a. These are not the words of one committed to scholarship. The Search Committee apparently did not share the Dean's concerns about Cummings' lack of commitment to scholarship because it recommended Cummings. However, its vote in favor of Cummings was only the first, not the last, step in the University's process for offering a candidate a position.

The trial court's decision is fully consonant with the *McDonnell Douglas* analytical model for determining whether an employee has been the victim of unlawful sex discrimination. Further, we cannot say that no two reasonable minds can agree with the trial court's factual findings. *Eichman,* 824 A.2d at 311. The trial court credited the Dean's testimony that it was Cummings' lack of scholarly growth, not his gender, that motivated the University. The trial court accepted as credible the Dean's statement that Cummings was offered a temporary position to allow him to cure his shortcomings as a scholar during his initial term with the University. Cummings tried to show that the University's proffered reason for the hiring decision was unworthy of credence, but ultimately, the trier of fact must decide which party's explanation of the employer's motivation it believes. *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Viewing the evidence in a light most favorable to the University, it is manifest that the trial court's denial of Cummings' requests for post-trial relief must be upheld.

---

17. As the Dean explained,

> [Dr. Cummings] was obviously coming to be a student teaching supervisor, but to me that is your job. But, what you do beyond that is important, I think, in terms of your own professional growth and your own development as a faculty member. And, I was just not—I just did not hear anything in that interview that would lead me to believe he was going to be doing those kinds of things.
>
> R.R. 209a.

For these reasons, we affirm the order of the trial court.

## ORDER

AND NOW, this 1st day of November, 2004, the order of the Court of Common Pleas of the 26th Judicial District (Columbia County Branch) dated February 5, 2004 in the above-captioned matter is hereby affirmed.