IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kathleen E. Topper, Executrix :
of the Estate of Hayden Topper, : No. 2674 C.D. 2015
Deceased, and on her own : Argued: November 14, 2016
behalf as his Widow, :
:
    Appellant :
:
    v. :
:
Maple Creek Inn, Inc., :
a Pennsylvania Corporation, :
and the Borough of Turtle Creek :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION
BY JUDGE WOJCIK                          FILED:  December 29, 2016

        Kathleen E. Topper (Appellant), widow of Hayden Topper (Decedent) and executrix of Decedent's estate, appeals from the judgment entered September 2, 2015, in a wrongful death and survival action she filed against the Borough of Turtle Creek (Borough) and the Maple Creek Inn (Inn).[1]  We affirm.

---

[1] Appellant filed a notice of appeal in Superior Court, which transferred the matter to this Court by order dated December 28, 2015.  Reproduced Record (R.R.) at 1326a, 1339a.

## Facts/Procedural history

At about 5:00 p.m. on the afternoon of November 18, 2012, Decedent left the Inn and went outside to wait for a ride. For reasons unknown, he walked across the street and fell near a storm drain inlet owned and maintained by the Borough. He subsequently died from head injuries. Appellant filed a complaint against the Inn and the Borough on September 4, 2013, and an amended complaint on December 16, 2013. R.R. at 1151a-76a.

As to the Borough, Appellant alleged that Decedent's fall was caused in part by the deteriorated and poorly lit condition of the Borough's street, curb, sidewalk, and drain opening, and by the Borough's negligence in the care, custody, and control of the area. According to the complaint, the pavement was crumbled and uneven; the approximately twenty-four-inch storm drain opening was large enough for an adult to fall into; the Borough was aware of the dangerous condition; it took no measures to prevent individuals from walking in the area; and these circumstances constituted a dangerous condition falling within exceptions to governmental immunity.

As to the Inn, Appellant alleged that it was aware of Decedent's struggles with alcohol use and violated its duties under the "Dram Shop Act"[2] by serving Decedent alcohol when he was visibly intoxicated, thereby affecting his ability to walk, his gait, and his judgment. The complaint alleged in part that

_____

[2] *See* Section 493 of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §4-493. In relevant part, section 493 of the Liquor Code makes it unlawful for any licensee to provide any liquor, malt, or brewed beverages to a person who is visibly intoxicated. That section further provides that no cause of action will exist against a licensee for selling or furnishing any alcoholic beverage to "any habitual drunkard or person of known intemperate habits unless the person sold, furnished or given alcohol is visibly intoxicated or is a minor." 47 P.S. §4-493.

Decedent's blood alcohol content (BAC) was circumstantial evidence from which a jury could reasonably infer that Decedent was exhibiting visible signs of intoxication while he was being served alcohol at the Inn.

In its answer and new matter, the Borough asserted the defense of governmental immunity[3] and alleged that Decedent's injuries were caused by his own negligence. R.R. at 1210a-17a. The Inn also filed an answer and new matter, admitting that its owners and employees were aware that Decedent had an alcohol problem; admitting that it served Decedent alcohol on the afternoon of November 18, 2012; but denying that Decedent was visibly intoxicated at the time. R.R. at 1186a-1209a.

During the trial, Appellant sought to prove that the Inn served Decedent while he was visibly intoxicated and that the Borough was negligent in allowing a dangerous condition of the sidewalk, street and storm drain to exist despite having knowledge of its condition. In addition to her own testimony, she presented expert testimony of two professional engineers, a medical toxicologist, and lay witnesses.

There was no dispute concerning the condition of the storm sewer and surrounding area. Ned Mitrovich, P.E., testified that the Borough Code[4] requires the Borough to regulate streets, sewers, sidewalks, curbs, culverts and drains, and the heights, grade, widths and slopes of their construction. Based on his review of photographs, he opined that the area around the storm drain included cracks in the asphalt, displaced bricks, and spray paint on a manhole cover, which indicated that

---

[3] *See* Sections 8541-8542 of the Judicial Code, 42 Pa.C.S. §§8541-8542.

[4] 8 Pa.C.S. §§101-3501.

3

the Borough was undertaking inspections in the process of complying with federal regulations. He also testified that the height of the inlet was in excess of twenty-three inches and that a person stepping in close proximity to the inlet would step down to his knee. Mitrovich believed that a pedestrian approaching the catch basin could easily lose his footing because of its extraordinary height, steep slope, and the presence of a hole in the pavement. R.R. at 241a.

Thomas Smith, P.E., PLS, similarly testified that he reviewed documents and photographs of the area. He opined that the storm sewer opening was approximately twenty-eight inches high, well above the standard height for such an opening, and that instead of stepping up six inches from the street to the curb, an average person would hit his knee. Smith further testified that the macadam was worn or cracked and severely sloping, such that the condition of the street itself was a tripping hazard; the condition of the curb, the cracks in the sidewalk, also were tripping hazards; and fallen leaves present in one photograph indicated that a pedestrian would have the false impression that the road was level. R.R. at 1356a-59a.

Appellant also offered the testimony of F. Harchelroad, M.D. Dr. Harchelroad is board-certified in both emergency medicine and medical toxicology. He stated that Decedent's medical records reflected that he suffered blunt force trauma about his face and fractures in the area of his right eye, with bleeding in the brain on the left side. He noted that EMT records indicated a strong odor of alcohol around Decedent, who was found unresponsive, with his legs on the sidewalk, his head on the street, and his mid-body in the storm drain. R.R. at 100a-02a.

4

Dr. Harchelroad testified that Decedent's BAC was .389, a level that would cause significant incoordination, difficulty in reaction time, difficulty judging distances, decreased ability to process new information, difficulty ambulating, and slurred speech. He stated that these signs would certainly have been visible thirty minutes or more before Decedent's fall. He added that to an untrained eye, a chronic alcoholic with a BAC of .100 or .150 might not appear intoxicated, but a person at Decedent's level would be visibly intoxicated. He further opined that the impairment in balance and coordination resulted in Decedent's fall. Dr. Harchelroad agreed with a report by Anthony F. Pizon, M.D., stating that Decedent's BAC could have been as high as .436 when he fell. R.R. at 120a, 124a, 130a-32a.

Dr. Harchelroad testified that chronic alcohol use destroys the part of the brain that controls balance, which is why "alcoholics are more likely to fall to begin with, and then when they drink again they're much more likely to fall." R.R. at 135a. He could not say whether Decedent could see the large opening at the storm drain, but he testified that, in Decedent's intoxicated state, if he had seen the opening, he would have been too slow to react to it in time to miss it. Dr. Harchelroad agreed that but for Decedent's intoxicated state, Decedent would not have fallen. R.R. at 148a.

Appellant testified that she and her husband had lived about two blocks from the Inn.[5] She said that Decedent was fifty-seven years old when he died and had retired seven years earlier. Appellant stated that Decedent's alcoholism had gotten worse over the last two years, and she had asked him to stop

---

[5] Appellant had a stroke sometime after Decedent's death and now lives in Virginia with her daughter.

5

drinking. She said that Decedent frequently visited the Inn, would come home through the basement door, and sometimes would be unable to walk and had to crawl up the steps. She testified that, in the months before his death, Decedent went to the Inn almost every day; most of the time he was brought home by a friend, and on one occasion he had soiled his clothes and was brought home in a wheelbarrow. R.R. at 488a-500a.

Appellant testified that she is a recovering alcoholic and stopped drinking in 2007. She said that from that time forward, Decedent drank all day every day. He also drank during the night; he kept a bottle by the sofa where he slept and would urinate in it. 528a-29a. Appellant stated that Decedent used a cane outside the house. She noticed that his right leg bothered him, but she said that no doctor had recommended a cane. R.R. at 534a.

The Borough submitted the deposition testimony of Dr. Pizon, who is board-certified in emergency medicine and medical toxicology. Dr. Pizon reviewed Decedent's medical records, Dr. Harchelroad's report, and Smith's report. He testified that Decedent had a severely elevated BAC of .389 approximately one hour after he fell. Dr. Pizon explained that a chronic alcoholic can metabolize alcohol at a faster than average rate and that calculations based on a second reading suggested that Decedent's BAC could have been as high as .436 when he fell. He stated that most people with an alcohol level that high would be unconscious and that chronic alcoholics frequently would be staggering, have slurred speech, be unable to walk, and not perceive things clearly. R.R. at 1448a-51a.

Dr. Pizon further testified that chronic alcohol abuse poisons the cerebellum in a way that can significantly affect a person's balance, irrespective of

6

his or her BAC. He explained that even if Decedent stopped drinking and remained sober, his balance might never improve. Dr. Pizon added that peer review studies reflect that chronic alcohol abuse impairs depth perception, reaction time, coordination and balance, and executive functions, impairing a person's ability to do multifaceted tasks. R.R. at 1451a-54a.

Dr. Pizon noted testimony of another witness that Decedent fell regularly, and he stated that someone with Decedent's alcohol level "is going to fall, period." R.R. at 1454a-55a. He added that Dr. Harchelroad agreed with his conclusion. R.R. at 1456a-62a. Questioned by Appellant's counsel, Dr. Pizon said it would be more likely than not that Decedent was visibly intoxicated while he was at the Inn, thirty minutes before his fall. R.R. at 1469a-70a. He affirmed the opinion he provided in his report that Decedent's "fall and injuries on November 18, 2012, could have been completely avoided had he not been intoxicated." R.R. at 1474a. During subsequent testimony, Dr. Pizon stated that in rendering his opinions he considered the condition of the area, and he repeatedly reaffirmed his conclusion that, irrespective of Decedent's ongoing balance problems, his severe level of intoxication at the time of the incident impaired his ability to adequately judge the need to avoid the area. R.R. at 1475a-80a.

Additionally, Dr. Pizon testified that it was more likely than not that an individual with .40 BAC would have shown some signs of intoxication. At the same time, he also said he was not surprised to hear that Decedent did not appear to be intoxicated. He explained that individuals who drink chronically have learned behaviors by which they can hide signs of their inebriation. As examples, he cited waiting for a distraction to walk to the bathroom, or walking slowly with a hand on a chair. R.R. at 1493a-94a, 1505a-06. Other witnesses testified that

7

Decedent shuffled when he walked and used a cane but that he did not have a cane on the night he fell. R.R. at 875a-76a.

Ron Wilson testified that he had known Decedent for over thirty years and that he and Decedent often drank together. Wilson stated that when he picked Decedent up at his house that night, Decedent said he had been drinking, and the two men went first to Wilson's house where they each had three beers. They next went to the Inn, arriving shortly after 2:00 p.m. Wilson said that he had two beers and Decedent had about three beers before they left the Inn. According to Wilson, the two men were planning to walk to his car, but Decedent's legs went weak, and Wilson left him standing by a fence while he went to get the car. R.R. at 808a-18a.

There were no witnesses to Decedent's fall. However, a number of individuals testified that he smelled of alcohol. Among them, Mary Jo Cole, Jeffrey Cole, and Yvette Worthy testified that they came upon Decedent after his fall and called 911; at the time they noted a very strong odor of alcohol. R.R. at 875a-76a.

The Inn offered the testimony of Frederick W. Fochtman, Ph.D., a forensic toxicologist, who stated that Decedent could have had a BAC of .389 or higher and still have appeared not to be intoxicated. Fochtman testified that chronic drinkers develop the ability to conceal signs of their impairment. He said that, given Decedent's chronic and long-term use of alcohol, the fact that he was drinking almost on a twenty-four-hour basis, the statements of four witnesses[6] that Decedent did not appear to be under the influence were consistent with his opinion. In response to questions from Appellant's attorney concerning a particular study,

---

[6] The four witnesses were Rick Staudt, a bar patron; bartender Elaine Fabrizi; Ron Wilson; and Yvette Worthy.

Fochtman noted that the study showed that with a BAC of .35, five of ten individuals showed normal speech, two a stable gait, and eight had an unimpaired ability to dress. R.R. at 926a, 932a-948a, 953a.

At the close of the case, the trial court directed a verdict against the Borough on the issue of negligence but left the issues of causation and damages for the jury. The trial court's jury instructions addressed contributory and comparative negligence. On February 17, 2015, the jury returned a verdict finding that the Inn was not negligent and apportioning 100% of causal negligence to Decedent.

Appellant filed a timely motion for post-trial relief on February 26, 2015, arguing that the trial court erred in instructing the jury on contributory and comparative negligence and asserting that she was entitled to judgment notwithstanding the verdict (judgment n.o.v.). The trial court issued an order on March 9, 2015, directing Appellant to file a brief in support of the motion thirty days after receipt of the transcript, and directing the defendants to file a brief thirty days after the filing of Appellant's brief. Appellant filed her brief on July 10, 2015. Defendants requested a ten-day extension of time to file a responsive brief, which Appellant did not oppose. The Inn filed a brief on August 21, 2015, and the Borough filed a brief on August 26, 2015. On September 2, 2015, the Borough filed a praecipe and obtained entry of judgment on the basis that the motion for post-trial relief was not decided within 120 days.[7] The praecipe was served on Appellant but not the trial court.

On September 15, 2015, the trial court scheduled argument on Appellant's post-trial motion for October 8, 2015. Appellant filed a petition to vacate the judgment, which the trial court granted by order of September 18, 2015,

---

[7] See Pa.R.C.P. No. 227.4.

9

and the trial court rescheduled argument on the motion for post-trial relief for September 28, 2015. The trial court subsequently vacated *that* order and cancelled argument, specifying that Appellant did not need to file a statement of errors complained of on appeal because the motion for post-trial relief set forth her objections. R.R. at 1335a. Appellant filed a notice of appeal and thereafter settled with the Inn, leaving the Borough as the only remaining defendant. R.R. at 1340a.

The trial court subsequently issued a Pa.R.A.P. 1925(a) opinion, stating that it erred in instructing the jury on contributory and comparative negligence because there was no evidence of a causal relationship between Decedent's negligence and his injuries, but, rather, the testimony attributed Decedent's fall to the defective condition of the storm drain area and the Borough's breach of its duties. The trial court stated that the award of no damages was not supported by the record but appeared to be the result of "passion of the jury" based on Decedent's BAC, even though the jury must have found that Decedent was not visibly intoxicated when it found the Inn not negligent. The trial court opined that a new trial on the issue of damages only should be ordered.

## Issues

Appellant argues that the trial court erred in instructing the jury on contributory and comparative negligence and that she is entitled to a new trial on the issue of damages or judgment n.o.v.[8] The Borough argues that Appellant waived any objection to the trial court's allegedly erroneous jury instructions.

---

[8] To the extent Appellant argues that this Court should affirm "the decision of the trial court," we note that the order appealed from is the entry of judgment in favor of the defendants and not the trial court's Pa.R.A.P. 1925(a) opinion, which was issued after that judgment was entered.

**<u>Discussion</u>**

We first address the Borough's contention that Appellant did not preserve any objection to the trial court's jury instructions because she did not object before the jury retired to deliberate. R.R. at 954a-1024a, 1098a-1139a. Pa.R.C.P. No. 227(b) provides that "[u]nless specifically allowed by the court, all exceptions to the charge to the jury shall be taken before the jury retires. On request of any party all such exceptions and arguments thereon shall be made out of hearing of the jury." The record confirms the Borough's assertions, and Appellant's failure to timely object to the jury instructions results in the waiver of her objections on appeal. *Snyder v. North Allegheny School District*, 722 A.2d 239, 243-44 (Pa. Cmwlth. 1998); *Krepps v. Snyder*, 112 A.3d 1246, 1254-55 (Pa. Super. 2015).

Appellant contends that she preserved her objection to the jury instructions by requesting and being granted a directed verdict against the Borough, by filing her proposed and supplemental jury instructions, and by timely filing a motion for post-trial relief. However, in making this argument, Appellant confuses the need to timely object to jury instructions with the preservation of the right to request judgment n.o.v.[9]

---

[9] Even if this issue had not been waived, Appellant could not prevail. Appellant's argument that the trial court erred relies on her inaccurate assertion that there was no evidence of a causal relationship between Decedent's negligence and his injury. As summarized above, the record includes ample evidence from which a jury could find that Decedent's intoxication was a substantial contributing cause of his injury. Additionally, as the Borough correctly notes, a defendant may raise the comparative negligence of an intoxicated plaintiff as a defense. *Miller v. Brass Rail Tavern, Inc.*, 702 A.2d 1072, 1081 (Pa. Super. 1997) (remanding for the trial court to consider whether the decedent's negligence, if any, barred recovery).

11

Appellant presents intertwined arguments that she is entitled to a new trial on the issue of damages, or judgment n.o.v. Portions of these arguments rest on Appellant's assertions that the trial court erred in instructing the jury, and to that extent, they are waived. Appellant also asserts that the Borough presented no evidence to establish causation between Decedent's negligence and his injuries.

In order to obtain a new trial, the moving party "must demonstrate in what way the trial error caused an incorrect result." *Department of General Services v. U.S. Mineral Products Co.*, 927 A.2d 717, 723 (Pa. Cmwlth. 2007). Additionally, "a new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice." *Id.* In ruling on a motion for a new trial, the court must review all of the evidence. *Id.*

Our review of the record reveals that Appellant has not preserved any issue regarding the trial court's error that would support the grant of a new trial. *See King v. Pittsburgh Water & Sewer Authority*, 139 A.3d 336, 341 (Pa. Cmwlth. 2016) (the first step in responding to a request for a new trial is to determine whether one or more mistakes occurred at trial).

To the extent that Appellant's argument concerning judgment n.o.v. presents a separate issue, we note that in deciding whether judgment n.o.v. is warranted, the court must consider the evidence and any conflicts therein in the light most favorable to the verdict winner, who is afforded the benefit of all reasonable factual inferences that arise from the evidence. *Nestor v. Commonwealth*, 658 A.2d 829, 832 (Pa. Cmwlth. 1993). "A judgment n.o.v. should only be entered in a clear case, with any doubt resolved in favor of the verdict winner. A judgment n.o.v. is appropriate where the evidence, and all

12

inferences drawn therefrom, viewed in the light most favorable to the verdict winner is insufficient to sustain the verdict." *Cummings v. State System of Higher Education*, 860 A.2d 650, 654 (Pa. Cmwlth. 2004).

In this case, there was little dispute that the Borough was negligent in allowing a dangerous condition of its property, of which it was aware, to exist for some time. Unfortunately, however, there also was evidence that Decedent was in that same area almost daily; that he was, or should have been, aware of the existing dangerous condition; and that, at the time he fell, he could not have safely navigated the area around the sewer drain due to his extremely high level of intoxication. Viewing all of the evidence and all inferences drawn therefrom in the light most favorable to the verdict winner, we cannot conclude that the evidence is insufficient to sustain the verdict. Consequently, we cannot conclude that the verdict is so contrary to the evidence "as to shock one's sense of justice." *Department of General Services.*

Accordingly, we are constrained to affirm.

_____
MICHAEL H. WOJCIK, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kathleen E. Topper, Executrix
of the Estate of Hayden Topper,
Deceased, and on her own
behalf as his Widow,

                       Appellant

             v.

Maple Creek Inn, Inc.,
a Pennsylvania Corporation,
and the Borough of Turtle Creek

:   No. 2674 C.D. 2015
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## O R D E R

AND NOW, this 29th day of December, 2016, the judgment entered on September 2, 2015, in the Court of Common Pleas of Allegheny County, at docket number GD 13-014596, is affirmed.

_____
MICHAEL H. WOJCIK, Judge